Leonard BARKAN, Plaintiff and
Settlement Objector Below,
Appellant,

v.

AMSTED INDUSTRIES, INCORPORAT-ED, Robert H. Wellington, Gordon R.
Lohman, Warren W. Rasmussen, Ed-ward J. Williams, Robert P. Reuss, Rog-er E. Anderson, O.C. Davis, Thomas L.
Martin, Jr., Bert E. Phillips, Robert T.
Powers and Donald E. Nordlund, De-fendants and Settlement Proponents
Below, Appellees,

Enid Mindich, Harry Lewis, Joseph S.
Blumenthal and Ernest Brooks, III,
Plaintiffs and Settlement Proponents
Below, Appellees.

Supreme Court of Delaware.

Submitted: March 21, 1989.
Decided: Dec. 18, 1989.

**1280**

Henry N. Herndon, Jr. of Morris, James, Hitchens & Williams, Wilmington, Harvey S. Kronfeld (argued) and Martin J. D'Urso of Harvey S. Kronfeld, P.C., Philadelphia, Pa., for appellant.

Thomas J. Allingham, II, of Skadden, Arps, Slate, Meagher & Flom, Wilmington, for defendant below, appellee, Amsted Industries, Inc.

R. Franklin Balotti and C. Stephen Bigler of Richards, Layton & Finger, Wilmington, for individual defendants below, appellees.

William C. Sterling, Jr. (argued), of Wachtell, Lipton, Rosen & Katz, New York City, for defendants below, appellees.

Irving Morris (argued), and Kevin Gross of Morris, Rosenthal, Monhait & Gross, P.A., Wilmington, for plaintiffs below, appellees.

Before CHRISTIE, C.J., and HORSEY and WALSH, JJ.

WALSH, Justice:

This is an appeal from a Court of Chancery decision that approved the settlement of several class action lawsuits. The litigation arose out of a management-sponsored leveraged buyout ("MBO") of all of the common stock of Amsted Industries, Inc. ("Amsted") by members of Amsted's management and a newly formed employee stock ownership plan ("ESOP"). Plaintiffs in four of the five class actions, together with the defendants below, appear as appellees here to urge affirmance of the Court of Chancery's decision. Another plaintiff-shareholder, Leonard Barkan ("Barkan"), appeals from the settlement order, charging that the Chancellor's decision constituted an abuse of discretion.

Barkan asserts three separate grounds for challenging the Chancellor's approval of the settlement. First, he argues that the Chancellor neglected to recognize that Amsted's directors had breached their fiduciary duties of loyalty and due care. Specifically, Barkan argues that the directors failed to implement procedures designed to maximize Amsted's sale price once its sale became inevitable, as required by *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, Del.Supr., 506 A.2d 173 (1986). According to Barkan, the Chancellor applied an impermissibly strict standard in determining the likelihood of this claim's success. Second, Barkan contends that the Chancellor applied the wrong standard in evaluating the materiality of certain information allegedly misstated or not disclosed to shareholders in connection with the MBO. Finally, Barkan asserts that the Chancellor was not free to approve a settlement that was not supported by present consideration.

The record contains evidence that the MBO was essentially fair to shareholders and that Amsted's directors did not seek to thwart higher bids. Under our standard of review, we cannot say that the Chancellor abused his discretion in approving the settlement. We further conclude that the Chancellor applied the correct standard in evaluating the materiality of the alleged nondisclosures and misstatements and that his findings pursuant to that standard do not constitute an abuse of discretion. *Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929 (1985). Finally, we find evidence to support the Chancellor's conclusion that this settlement fits within an exception to the general rule that settlements of class actions must be supported by present consideration. *Chickering v. Giles*, Del.Ch., 270 A.2d 373 (1970). Accordingly, we affirm the Chancellor's decision in all respects.

I

The facts giving rise to this litigation are essentially uncontroverted, but their complexities merit some discussion. In early

1985, Charles Hurwitz ("Hurwitz") began acquiring a significant number of shares of Amsted common stock through an entity known as MAXXAM Associates. Although Hurwitz claimed that the shares were being purchased for investment purposes only, he was widely recognized as a sophisticated investor in the market for corporate control. Accordingly, Amsted's board of directors retained Goldman, Sachs & Co. in May, 1985 to counsel them concerning possible responses to Hurwitz's overture. Goldman Sachs advised the board that Hurwitz had earned a reputation for attempting to acquire control of a corporation at a price below its real value or, alternatively, to extract "greenmail." The investment bankers suggested an array of possible defenses to the challenge posed by Hurwitz. These included a stock purchase rights plan, a stock repurchase by the corporation, a friendly acquisition by a third party, a management-sponsored leveraged buyout, and a management-sponsored leveraged buyout involving an ESOP.

Amsted's board chose to adopt a common stock purchase rights plan, commonly referred to as a "poison pill". Under its terms, in the event that any person or group acquired 20% or more of Amsted's common shares or announced an offer that would enable any person or group to own 30% or more of such shares, holders of rights issued pursuant to the plan would be entitled to purchase newly issued Amsted stock. More important, the plan contained a "flip-over" provision, which enabled rights holders to buy the stock of any acquiring corporation at a significant discount. The goal of the plan was to prevent any business combination of which the board did not approve. The board could give a merger its blessing by redeeming the plan rights.

With the rights plan in place, Amsted began to consider the possibility of undertaking a leveraged buyout involving an ESOP. Because such a transaction offered significant tax advantages, it was felt that it would provide shareholders with the highest possible price for their shares. On

September 26, 1985, the Amsted board authorized the establishment of an ESOP, although no definite proposal for undertaking an MBO was discussed at that time. On October 22, 1985, however, the Amsted board established a Special Committee of its members to investigate the merits of any transaction involving a change of corporate control. The Special Committee was composed of directors who were neither officers of Amsted nor beneficiaries of the ESOP. Although the Special Committee was given the power to evaluate the fairness of any acquisition proposal made by a third party, the Committee was instructed not to engage in an active search for alternatives to an MBO.

Several days later, on October 29, 1985, the Amsted board terminated certain pension plans covering substantially all Amsted employees who were not subject to collective bargaining agreements. The board's goal was to make the excess assets in the plans (estimated by Goldman Sachs to be worth approximately $75 million) available to finance an MBO. On November 4, 1985, an MBO proposal was finally presented to the Amsted board by the ESOP trustees and members of Amsted senior management (the "MBO Group"). Under the proposal, the MBO Group would purchase all of Amsted's outstanding stock for $37 per share of cash and $27 per share in principal amount of a new issue of subordinated discount debentures, valued at $11 per share.

The next day, the first of the suits involved in this litigation was filed. Three similar suits were filed in the course of the following week. It was the plaintiffs in these four suits who eventually reached the settlement with Amsted that is the subject of this appeal.[1] At about the same time, the MBO proposal hit a roadblock. Citibank, which had informally agreed to assemble financing for the deal, concluded that the proposed transaction was too highly leveraged and withdrew its support. On November 13, 1985, First National Bank of Chicago ("First National") agreed to take Citibank's place. However, First National

1. Barkan's suit was not filed until March 12, 1986.

proposed that $3 per share of cash in the original proposal be replaced with preferred stock having a face value of $4 and a market value of $3. The total value of this package of consideration remained $48 per share.

Through the rest of November, December, and much of January, Goldman Sachs and the MBO Group worked to arrange financing for the transaction proposed by First National. By late January, however, the MBO Group decided that the value of the consideration offered would have to be reduced. Decreased earnings in the first quarter of fiscal year 1986 (which ended December 31, 1985) led the MBO Group to doubt Amsted's ability to perform at the level previously anticipated. Accordingly, when the MBO Group finally went to Amsted's board with a proposal on January 29, 1986, they offered a $45 per share package, with $31 per share in cash, $4 per share in preferred stock valued at $3 per share, and $27 in principal amount of subordinated discount debentures valued at $11 per share.

The Special Committee met that day to consider the proposal. Salomon Brothers, the Special Committee's investment advisors, opined that a price of $45 was "high in the range of fairness." The Special Committee, however, directed Salomon Brothers to seek an increase in the cash component of the package. The MBO Group quickly agreed to offer an additional $1.25 in cash, making the total consideration worth $46.25 per share. The Special Committee approved the increased offer and recommended it to the full board, which also gave its blessing to the MBO. The board also voted to redeem the common stock purchase rights plan in order to make the transaction possible. An Exchange Offer followed shortly thereafter on February 5, 1986.

At this point, the long-quiescent Hurwitz approached Goldman Sachs and voiced his dissatisfaction with the adequacy of the offer. After some negotiation, Hurwitz agreed to tender his shares if the cash component of the transaction were increased again, by $.75 per share to $33 per share. Goldman Sachs agreed to recommend such an increase if the plaintiffs in the four lawsuits filed in November, 1985 could be persuaded to reach a settlement. The plaintiffs had not yet conducted any discovery nor amended their complaints to reflect the developments that had occurred since November. Nevertheless, on February 10, 1986, the plaintiffs agreed to a full settlement, conditioned upon their being permitted to conduct "confirmatory discovery" at a later date. On February 19, 1986, the Exchange Offer was amended to reflect the increased cash consideration. The Offer closed on March 5, 1986, with 89% of the outstanding stock having been tendered. The MBO itself was closed on June 2, 1986.

On March 12, 1986, Barkan commenced his action challenging the Exchange Offer. On July 3, 1986, the original plaintiffs and the defendants filed a Stipulation and Agreement of Compromise and Settlement (the "Settlement Agreement") with the Court of Chancery. The Settlement Agreement was approved by the Chancellor, who determined that although difficult questions were raised by the course of events leading to the settlement, the settlement was fundamentally fair. *In re Amsted Indus. Litig.*, Del.Ch., C.A. No. 8224, 1988 WL 92736, Allen, C. (Aug. 24, 1988).

## II

We begin by emphasizing our limited standard and scope of review in this appeal. As we recently reiterated in *Nottingham Partners v. Dana*, Del.Supr., 564 A.2d 1089 (1989), an important distinction must be drawn between the standards that the Court of Chancery employs in evaluating the fairness of a class action settlement and the standards that this Court employs in reviewing the propriety of the lower court's decision. The Court of Chancery plays a special role when asked to approve the settlement of a class or derivative action. It must balance the policy preference for settlement against the need to insure that the interests of the class have been fairly represented. *Rome v. Archer*, Del. Supr., 197 A.2d 49, 53 (1964). Thus, the

Court of Chancery must carefully consider all challenges to the fairness of the settlement but without actually trying the issues presented. "Under *Rome*, the [C]ourt's function is to consider the nature of the claim, the possible defenses thereto, the legal and factual circumstances of the case, and then to apply its own business judgment in deciding whether the settlement is reasonable in light of these factors." *Polk v. Good*, Del.Supr., 507 A.2d 531, 535 (1986) (citing *Rome v. Archer*, 197 A.2d at 53). While the Court of Chancery is under a duty to be probing in its consideration of the issues raised by a settlement, the Court is also vested with considerable discretion.

◼ The Court of Chancery's special role is matched by our own limited one. Because the Court of Chancery's decision constitutes an exercise of discretion, we review the record simply to determine whether that discretion has been abused. *Polk v. Good*, 507 A.2d at 536. We do not exercise our own business judgment in an effort to evaluate independently the intrinsic fairness of the settlement. Rather, if the findings and conclusions of the Court of Chancery "are supported by the record and are the product of an orderly and logical deductive process, they will be accepted" and the decision will be affirmed. *Id.* (citing *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972)).

◼ Appellant Barkan asserts that we should apply a stricter level of review to the legal determinations that underlie the Court of Chancery's decision. It is true that our review of questions of law is plenary. *Fiduciary Trust Co. of N.Y. v. Fiduciary Trust Co. of N.Y.*, Del.Supr., 445 A.2d 927, 930–31 (1982). However, when the Court of Chancery reviews the fairness of a settlement, it must evaluate all of the circumstances of the settlement by using its own business judgment. Thus, while we might find error if a faulty legal standard were employed, it must be stressed that the Court of Chancery's most important yardstick of a settlement's fairness is its business judgment. Because the Court of Chancery is in the best position to evaluate the factors that support a settlement,

we will not second-guess its business judgment upon appeal. Rather, if there is evidence in the record to support the Chancellor's findings and if his conclusions are not the product of errors of law, we must affirm the settlement approval. *Rome v. Archer*, 197 A.2d at 54.

III

◼ We first address Barkan's contention that the Chancellor abused his discretion by approving a settlement that was not supported by present consideration. Barkan argues that although the parties to the Settlement Agreement reached an accord in February of 1986, it is significant that they did not file the actual Settlement Agreement with the Court of Chancery until July 3, 1986, more than a month after the MBO had closed. According to Barkan, the closing of the MBO rendered the issues raised in the settled lawsuits moot. Thus, Barkan continues, when the Settlement Agreement was filed, the class of plaintiffs received nothing in exchange for the dismissal of their claims with prejudice.

Barkan cites *Chickering v. Giles*, Del. Ch., 270 A.2d 373 (1970), in support of his argument. In *Chickering*, the Court of Chancery declined to give its approval to a settlement that the parties had implemented before the Court had a chance to rule on its fairness. The Court found that such a *fait accompli* constituted an abuse of the class action process because it deprived the Court of its important oversight role. Accordingly, the court declined to extend to the settlement the *res judicata* effect that its proponents sought. The Court recognized an important exception to the rule that it expounded, however. "In a given case the parties may be faced with an emergency or facts which compel action before the Court can give notice or hold a hearing on a settlement petition." *Id.* at 375.

In this case, the Chancellor found that the events surrounding the Settlement Agreement made the exception to the *Chickering* rule applicable. Moreover, the Chancellor found that the $.75 per share increase in the cash component of the Ex-

change Offer provided sufficient consideration to support the Settlement Agreement, even though it was paid before the Settlement Agreement was finalized. Because both findings are supported by ample evidence in the record, we find no abuse of discretion in the Chancellor's actions.

We are mindful of the fact that it was Hurwitz, rather than representatives of the plaintiff class, that induced the MBO Group to pay the higher price. Nevertheless, payment of the additional consideration was expressly conditioned upon the plaintiffs' agreement to settle all suits arising from the transaction. The plaintiffs reached such an agreement in direct response to the offer of additional cash. As the Chancellor pointed out, a measure of uncertainty is created by the fact that the $.75 per share may also be viewed as consideration for the shareholders' surrender of stock pursuant to the Exchange Offer. However, it is not difficult to understand why the consideration for settlement of a case such as this one should take the form of a higher per share price. The plaintiffs had asserted that the process leading to the MBO had resulted in a share price that was inadequate. When the plaintiffs decided that the price was fair, however, they became willing to relinquish their claims. Thus, it was not improper for the Chancellor to find that at least a portion of the $.75 per share price increase constituted the *quid pro quo* for the Settlement Agreement.

The question that remains is whether the parties were justified in consummating the MBO without awaiting the Court of Chancery's approval. The record reveals that there were valid reasons for proceeding with the MBO on a relatively expedited schedule. In particular, the financing for the MBO had been made contingent upon the transaction's closing by June 30, 1986. To meet that closing date, the MBO Group had to commence its Exchange Offer shortly after all parties agreed upon a fair price. Thus, it was reasonable for the Chancellor to conclude that there was a valid business reason for allowing the MBO to go forward, a reason sufficient to bring the transaction within the exception to the rule in *Chickering*.

## IV

We turn now to the central argument presented by Barkan in challenging the propriety of the Chancellor's ruling. Barkan charges that the directors of Amsted breached their fiduciary duties of loyalty and due care by overseeing a selling process that was not designed to maximize the price paid to shareholders. In short, Barkan contends that the directors neglected their duties under the auction standard announced in *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, Del.Supr., 506 A.2d 173 (1986). According to Barkan, the Chancellor cursorily brushed aside Barkan's charges by declaring that they would be "difficult to prove" if the Settlement Agreement were rejected. *In re Amsted Indus. Litig.*, letter op. at 21. Barkan alleges that the Chancellor thereby relieved the proponents of the Settlement Agreement of the burden of proving the fairness of the Agreement, instead imposing upon Barkan the burden of proving that his case would not be "difficult to prove."

We do not believe that the Chancellor applied the wrong standard in evaluating the weight of Barkan's claims. The Chancellor's view of the validity of any challenges to the fairness of a settlement is an important determinant of his ultimate decision. *See Polk v. Good*, 507 A.2d at 536; *Rome v. Archer*, 197 A.2d at 53. The strength of claims raised in a class action lawsuit helps to determine whether the consideration received for their settlement is adequate and whether dismissal with prejudice is appropriate. Thus, if the Chancellor were to find that the plaintiff class was being asked to sacrifice a facially credible claim for a small consideration, he would be justified in rejecting a settlement as unfair. Conversely, where the Chancellor finds that the plaintiff's potential challenges have little chance of success, he has good reason to approve the proposed settlement. When the Chancellor found that Barkan's challenges would be "difficult to prove" he did not relieve the Settlement

Agreement's proponents of their burden of proving its fairness. Rather, he found that the proponents had met that burden by showing that the settlement adequately compensated shareholders for the sacrifice of a claim whose chances for success were minimal.

■ Barkan also challenges the correctness of the Chancellor's evaluation of the merits of his breach of duty claims. He asserts that the directors of Amsted committed egregious breaches of their duties and that the Chancellor overlooked clear evidence of impropriety in finding that the process that led to the MBO and the Settlement Agreement was fair to shareholders. In short, Barkan would have us rule that his claims would not be "difficult to prove." We find, however, that there is ample evidence in the record to support the Chancellor's evaluation of Barkan's breach of duty claims.

■ There is some dispute among the parties as to the meaning of *Revlon*, as well as its relevance to the outcome of this case. We believe that the general principles announced in *Revlon*, in *Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946 (1985), and in *Moran v. Household International, Inc.*, Del.Supr., 500 A.2d 1346 (1985) govern this case and every case in which a fundamental change of corporate control occurs or is contemplated.[2] However, the basic teaching of these precedents is simply that the directors must act in accordance with their fundamental duties of care and loyalty. *Unocal*, 493 A.2d at 954–55; *Revlon*, 506 A.2d at 180. It is true that a court evaluating the propriety of a change of control or a takeover defense must be mindful of "the omnipresent specter that a board may be acting primarily in its own interests, rather than

those of the corporation and its shareholders." *Unocal*, 493 A.2d at 954. Nevertheless, there is no single blueprint that a board must follow to fulfill its duties. A stereotypical approach to the sale and acquisition of corporate control is not to be expected in the face of the evolving techniques and financing devices employed in today's corporate environment. *Mills Acquisition Co. v. Macmillan, Inc.*, Del. Supr., 559 A.2d 1261, 1286–88 (1988). Rather, a board's actions must be evaluated in light of relevant circumstances to determine if they were undertaken with due diligence and in good faith. If no breach of duty is found, the board's actions are entitled to the protections of the business judgment rule. *Id.* at 954–55.

This Court has found that certain fact patterns demand certain responses from the directors. Notably, in *Revlon* we held that when several suitors are actively bidding for control of a corporation, the directors may not use defensive tactics that destroy the auction process. *Revlon*, 506 A.2d at 182–85. When it becomes clear that the auction will result in a change of corporate control, the board must act in a neutral manner to encourage the highest possible price for shareholders. *Id.* However, *Revlon* does not demand that every change in the control of a Delaware corporation be preceded by a heated bidding contest. *Revlon* is merely one of an unbroken line of cases that seek to prevent the conflicts of interest that arise in the field of mergers and acquisitions by demanding that directors act with scrupulous concern for fairness to shareholders. When multiple bidders are competing for control, this concern for fairness forbids directors from using defensive mechanisms to thwart an auction or to favor one bidder

---

**2.** The defendants have intimated that *Revlon* and its progeny are not applicable to this case because *Revlon* was decided after the operative facts of this case occurred. We believe, however, that neither due process nor this Court's conception of fairness requires that the retroactive effect of our decisions be limited. *See Great N. Ry. v. Sunburst Oil & Ref. Co.*, 287 U.S. 358, 364–65, 53 S.Ct. 145, 148–49, 77 L.Ed. 360 (1932). Because the rule in *Revlon* is derived from fundamental principles of corporate law

and flows directly from precedents such as *Unocal*, its announcement did not produce a seismic shift in the law governing changes of corporate control. Accordingly, it is just as appropriate to judge the conduct of Amsted's directors under the principles of *Revlon* as it was to judge the conduct of Revlon's board itself under those principles. *But cf. Weinberger v. UOP, Inc.*, Del. Supr., 457 A.2d 701, 714–15 (1983) (limiting retroactive effect of decision that overruled prior law).

over another. *Id.* When the board is considering a single offer and has no reliable grounds upon which to judge its adequacy, this concern for fairness demands a canvas of the market to determine if higher bids may be elicited. *In re Fort Howard Corp. Shareholders Litig.*, Del.Ch., C.A. No. 991, 1988 WL 83147 (Aug. 8, 1988). When, however, the directors possess a body of reliable evidence with which to evaluate the fairness of a transaction, they may approve that transaction without conducting an active survey of the market. As the Chancellor recognized, the circumstances in which this passive approach is acceptable are limited. "A decent respect for reality forces one to admit that ... advice [of an investment banker] is frequently a pale substitute for the dependable information that a canvas of the relevant market can provide." *In re Amsted Indus. Litig.*, letter op. at 19–20. The need for adequate information is central to the enlightened evaluation of a transaction that a board must make. Nevertheless, there is no single method that a board must employ to acquire such information. Here, the Chancellor found that the advice of the Special Committee's investment bankers, when coupled with the special circumstances surrounding the negotiation and consummation of the MBO, supported a finding that Amsted's directors had acted in good faith to arrange the best possible transaction for shareholders. Our own review of the record leads us to rule that the Chancellor's finding was well within the scope of his discretion.

Several factors provide the basis for the Chancellor's finding. First, the investment community had been aware that Amsted was a likely target for a takeover or an MBO from the moment that Hurwitz announced his sizeable interest in the corporation. In the parlance of the market, Hurwitz's actions put Amsted "in play." Yet in the ten months that passed between Hurwitz's appearance on the scene and the closing of the Exchange Offer, not one bidder emerged to make an offer for control of Amsted. Of course, Amsted was shielded by its stock purchase rights plan during much of this period. Nevertheless,

the spate of takeover litigation that has confronted Delaware courts in recent years readily demonstrates that such "poison pills" do not prevent rival bidders from expressing their interest in acquiring a corporation. *See, e.g., Mills Acquisition Co. v. Macmillan, Inc.*, Del.Supr., 559 A.2d 1261 (1988); *Grand Metro. Pub. Ltd. Co. v. Pillsbury Co.*, Del.Ch., 558 A.2d 1049 (1988); *Doskocil Cos. v. Griggy*, Del.Ch., C.A. No. 10,095, 1988 WL 105751 (Oct. 7, 1988). When properly employed, the function of a "poison pill" is to protect shareholders from coercive takeover tactics and to enhance the bidding for a corporation that is for sale. *Moran*, 500 A.2d at 1354–56. Because potential bidders know that a pill may not be used to entrench management or to unfairly favor one bidder over another, they have no reason to refrain from bidding if they believe that they can make a profitable offer for control of the corporation. *Id.* Moreover, the Amsted board redeemed the rights plan five weeks before the closing of the Exchange Offer, thereby leaving an extended period of time during which Amsted was wholly unshielded from competing tender offers. We do not suggest that the absence of rival bids is sufficient to certify as correct a board's decision that a given transaction is fair to shareholders. However, when it is widely known that some change of control is in the offing and no rival bids are forthcoming over an extended period of time, that fact is supportive of the board's decision to proceed.

More important, the Amsted board had valid reasons for believing that no rival bidder would be able to surpass the price offered by the MBO Group. Including an ESOP in the transaction allowed the MBO Group to receive significant tax advantages that could be reflected in the price offered to shareholders. Even so, the MBO Group had some difficulty arranging financing for its proposal because lenders felt that the performance of the corporation might be dampened by cyclical downturns. In fact, such an event occurred in late 1985, as Amsted's earnings for the first quarter of fiscal year 1986 suffered a significant de-

cline. Thus, when in late January, 1986, Salomon Brothers opined that $45 per share was a very fair price, the Board had good reason not only to accept Salomon Brothers opinion, but also to believe that no alternative deal could give shareholders a better price. As the MBO Group increased its offer to $46.25 and then to $47 per share, the evidence supporting the fairness of the deal increased still further. Thus, we believe that when the Exchange Offer was made, the directors could conclude in good faith that they had approved the best possible deal for shareholders.

 We certainly do not condone in all instances the imposition of the sort of "no-shop" restriction that bound Amsted's Special Committee. Where a board has no reasonable basis upon which to judge the adequacy of a contemplated transaction, a no-shop restriction gives rise to the inference that the board seeks to forestall competing bids. Even here, a judicious market survey might have been desirable, since it would have made it clear beyond question that the board was acting to protect the shareholder's interests. Thus, while numerous factors—timing, publicity, tax advantages, and Amsted's declining performance—point to the directors' good faith belief that the shareholders were getting the best price, we decline to fashion an iron-clad rule for determining when a market test is not required. The evidence that will support a finding of good faith in the absence of some sort of market test is by nature circumstantial; therefore, its evaluation by a court must be open-textured. However, the crucial element supporting a finding of good faith is knowledge. It must be clear that the board had sufficient knowledge of relevant markets to form the basis for its belief that it acted in the best interests of the shareholders. The situations in which a completely passive approach to acquiring such knowledge is appropriate are limited. The Chancellor found this to be such a situation, however, and we believe his finding to be within the scope of his discretion.

## V

 Finally, we turn to Barkan's allegations that the information provided to shareholders in connection with the Exchange Offer was marred by material omissions and misrepresentations. Barkan charges that the Chancellor applied the wrong standard in evaluating the materiality of these alleged distortions. According to Barkan, the Chancellor erred in applying the test for materiality adopted in *Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929 (1985) rather than a stricter test allegedly set forth in *Eisenberg v. Chicago Milwaukee Corp.*, Del.Ch., 537 A.2d 1051 (1987). This argument is premised upon a misreading of *Eisenberg*. That case did not adopt a definition of materiality that differed from the one in *Rosenblatt*. Rather, *Eisenberg* admonished courts to be particularly mindful of the danger of omissions and misrepresentations in situations where directors are confronted with conflicts of interest. *Eisenberg*, 537 A.2d at 1057. Certainly, the role of management in an MBO creates the potential for such conflicts of interest. The information supplied by management in support of its position may be especially problematic when competing bidders are not present to keep management honest. A recognition of these dangers does not affect the definition of materiality, however. Thus, if an omission is immaterial, the fact that it was made by a party with some incentive to be less than candid cannot render the omission material.

 Under *Rosenblatt*, the standard for materiality is quite clear. The standard requires:

a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*Rosenblatt,* 493 A.2d at 944 (quoting *TSC Indus. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)). While it need not be shown that an omission or distortion would have made an investor change his overall view of a proposed transaction, it must be shown that the fact in question would have been relevant to him. We believe that the Chancellor was correct in finding that none of the misrepresentations and omissions alleged by Barkan meet this test.

It is not necessary to address each of Barkan's charges on this issue in detail. The fundamental point that Barkan seeks to make is that the Amsted board and the Special Committee examined many different estimates of the value of the corporation and the resources available to finance an MBO throughout the ten months prior to the consummation of the deal. At various times, some of these estimates were more optimistic than the figures that were ultimately presented to shareholders in connection with the Exchange Offer. Barkan infers from these discrepancies that the directors were attempting to conceal the alleged inadequacy of the Exchange Offer's price. The Chancellor found, however, that many of the undisclosed estimates were calculated for purposes other than providing an accurate measure of Amsted's control value. For example, a study conducted by Arthur D. Little Valuation, Inc. found that Amsted's liquidation value could be as high as $65 per share. However, the study was based upon estimates of the replacement value of Amsted's assets and thus had little bearing upon the control value of Amsted's assets as they existed. The study was prepared for the purpose of revaluing Amsted's assets to prevent an impairment of the corporation's capital as a result of the MBO. Thus, the $65 figure did not represent what someone would pay for Amsted, but rather what someone would pay to assemble a corporation identical to Amsted. Understandably, the latter figure was higher than the price paid in the MBO.

In a similar vein, Barkan attacks Amsted for not providing an accurate disclosure of the value of certain unterminated pension plans. Unlike other plans that had been terminated to provide additional resources for the MBO, these plans were covered by existing collective bargaining agreements that made their discontinuance impossible. Accordingly, their value was irrelevant to the financing of the MBO.

The Chancellor also noted the difficulty inherent in basing any claim of incomplete disclosure upon the failure to disclose a given estimate of value or resources. Even the best estimate constitutes an exercise in enlightened speculation that may or may not be borne out by subsequent developments. Nevertheless, Barkan charges that it is material that Amsted provided one set of estimates of certain financial data to lenders and then at a much later date provided a more conservative set to shareholders. He also alleges that estimates of the amount of debt that Amsted could incur later turned out to be low. We see no reason why candor would demand that shareholders be deluged with conflicting estimates of financial performance, many of which have been made stale by the passage of time. Rather, the duty to disclose requires that a corporation in Amsted's position give shareholders up-to-date financial estimates that provide a reasonable basis for an informed investment decision. Immaterial discrepancies between these estimates and earlier figures or between estimates and subsequent developments cannot provide a basis for liability.

Barkan presents several more challenges to the completeness of the defendant's disclosures, all of which may be dealt with in summary fashion. He argues that the defendants should have disclosed: 1) the manner in which the Special Committee was chosen; 2) Amsted's payment to Salomon Brothers of a small commission in connection with an unrelated matter; 3) the existence of the no-shop restriction on the Special Committee; 4) details concerning the status of the plaintiffs-appellees' lawsuits; and 5) any plans for accommodation of Amsted's old management in the post-MBO entity. The Chancellor found that all of this information is immaterial, because none of it has any bearing upon the ade-

quacy of the Exchange Offer. We agree with the Chancellor's conclusion.

### VI

We conclude that the Chancellor did not abuse his discretion in approving a full settlement of the lawsuits challenging the MBO. The Chancellor correctly found that none of the plaintiffs' allegations had a high probability of success on the merits and that an adequate consideration had been paid for their release. These findings are supported by ample evidence on the record. Accordingly, the Order of the Court of Chancery is AFFIRMED.