## In re RESORTS INTERNATIONAL SHAREHOLDERS LITIGATION APPEALS.

Supreme Court of Delaware.

Submitted: March 28, 1989.
Decided: Jan. 26, 1990.

Edward M. McNally (argued), and Lewis H. Lazarus of Morris, James, Hitchens &

Williams, Wilmington, for appellant Class A Shareholder David Dion.

Avrom S. Fischer (argued), Pro Hac Vice, Brooklyn, N.Y., Henry Heiman of Heiman, Aber & Goldlust, Wilmington, Michael Coren, of counsel, of Krimsky, Levy, Angstreich, Finney, Mann & Burkett, P.C., Philadelphia, Pa., for Objector appellants Class B Shareholders Alvin Abrams, Net Worth Partners, Tobias Weiss, and G. Russell Schweiker.

Kenneth J. Nachbar (argued), and A. Gilchrist Sparks, III of Morris, Nichols, Arsht & Tunnell, Wilmington, for appellees George A. Bariscillo, Jr., William Druz and Mitchell Sviridoff.

Pamela S. Tikellis (argued), and Richard D. Greenfield of Greenfield & Chimicles, Wilmington, Liaison Counsel for Class A appellees.

Robert K. Payson of Potter, Anderson & Corroon, Wilmington, for appellees Resorts Intern., Inc., I.G. Davis, Robert D. Peloquin, H. Steven Norton, Matthew B. Kearney and John M. Donnelly.

Januar D. Bove, Jr. of Connolly, Bove, Lodge & Hutz, Wilmington, for appellees Thomas S. Murphy and Henry B. Murphy, As Executors of the Estate of James N. Crosby, Henry B. Murphy, Charles E. Murphy, William M. Crosby and John F. Crosby.

Fred Lowenschuss of Fred Lowenschuss Associates, Philadelphia, Pa., pro se.

David C. McBride and Bruce M. Stargatt of Young, Conaway, Stargatt & Taylor, Wilmington, Richard L. Posen of Willkie, Farr & Gallagher, New York City, for appellees Donald J. Trump, Robert S. Trump, Harvey I. Freeman, The Trump Hotel Corp. and The Trump Organization.

Before CHRISTIE, C.J., HORSEY and MOORE, JJ.

HORSEY, Justice:

Two Class A and four Class B stockholders ("the objectors") of Resorts International, Inc. ("Resorts"), a Delaware corporation, contest an "Amended Settlement" of numerous consolidated class actions and derivative lawsuits filed by both Class A and Class B shareholders of Resorts. The shareholder suits encompass two separate takeover transactions. The first transaction involves Donald Trump's purchase of a controlling interest in Resorts, followed by his unsuccessful attempt to take Resorts private. These events generated fourteen shareholder suits which culminated in a proposed "Original Settlement." A hearing on the proposed settlement of claims relating to the first transaction was mooted in March 1988 by Merv Griffin's later successful bid to acquire Resorts through a buy-out of Trump's interests and a cash tender offer for the remaining publicly owned shares, the second transaction. The Original Settlement was then withdrawn. Claims relating to both transactions were later resolved under a proposed Amended Settlement, subject to the required notice and court approval under Rules 23 and 23.1. At all relevant times, Resorts was a deeply indebted owner of a partially constructed hotel casino complex in Atlantic City, New Jersey, known as "the Taj Mahal."

On August 18, 1988, the Court of Chancery held a hearing on the proposed Amended Settlement. Eight objectors appeared from both Class A and Class B shareholders, making various objections to terms of the Amended Settlement and its preclusion of any opt-out. In a memorandum opinion dated September 7, 1988, the court approved the Amended Settlement and ruled that it should bind all shareholders of Resorts except nontendering Class B shareholders who had timely perfected their statutory appraisal rights. Two groups of shareholder objectors have appealed: David Dion and Fred Lowenschuss, two Class A nontendering/dissenting shareholders who seek to pursue *Rabkin/Cede* rights;[1] and Alvin Abrams, Net

---

1. *Rabkin v. Philip A. Hunt Chemical Corp.,* Del. Supr., 498 A.2d 1099 (1985); *Cede & Company v. Technicolor, Inc.,* Del.Supr., 542 A.2d 1182 (1988). A *"Rabkin/Cede* claim" connotes a claim by a minority shareholder who dissents from a cash-out merger to pursue both an appraisal remedy under 8 *Del. C.* § 262 and a

Worth Partners, Tobias Weiss, and G. Russell Schweiker, four Class B nontendering shareholders who had failed to timely assert appraisal rights ["the Class B Objectors"]. Applying our well-established standard of review, *Barkan v. Amsted Indus., Inc.*, Del.Supr., 567 A.2d 1279 (1989); *Selfe v. Joseph*, Del.Supr., 501 A.2d 409, 411 (1985), we affirm the court's rulings on all issues.[2]

## I

Resorts is a Delaware corporation engaged in the operation of gambling, resort and hotel facilities. Prior to the period relevant to this case, the company had two classes of stock, Class A and Class B, which were alike in all respects except that the Class B shares had one hundred times the voting power of Class A shares. By 1985, Resorts encountered serious financial difficulties. In 1983 the corporation began construction of a new casino, the Taj Mahal, an elephantine project intended to be Atlantic City's largest gambling hotel. Although the cost of construction had initially been estimated at $185,000,000, by mid–1987 the estimated cost had nearly quadrupled to $800,000,000. By then approximately $350,000,000 had been spent and the casino was only forty percent completed. Already burdened by an existing corporate debt of $550,000,000, Resorts found it needed to borrow that much again, or more, to complete the casino.

It was against this background that, on July 21, 1987, Trump purchased from the estate of Resorts' founder, James M. Crosby, and other family members, 585,067 shares of the Class B common stock at $135 per share at a cost of $78,984,045. Through this private acquisition of what constituted 72.3% of the voting power of

Resorts' outstanding stock, Trump obtained control of Resorts. The three Crosby designees on Resorts' board of directors then resigned and were replaced by Trump and two of his executives. The remaining three directors of Resorts were outside, independent directors as required by New Jersey law.

Three months later, Trump's designees on Resorts' board of directors, with the approval of the three independent directors, authorized Resorts to enter into a "Comprehensive Services Agreement" ("CSA") with Trump Hotel Corporation ("Trump Hotel Corp"), a New Jersey hotel/casino corporation. Trump Hotel Corp was wholly owned by Donald Trump. The Agreement was intended to strengthen Resorts' management capabilities through the loan of Trump's name and Trump Hotel Corp's management know-how to the Taj Mahal project, then in desperate need of additional financing. Beyond that, the CSA provided that for ten years Trump Hotel Corp would provide Resorts with financial, promotional, planning and development services. In return, Resorts would pay Trump Hotel Corp an annual fee of 1.75% of Resorts' adjusted gross revenues plus 15% of Resorts' adjusted net income. Resorts would also pay Trump Hotel Corp 3% of the construction cost of the Taj Mahal.[3]

Within a month, Trump commenced a tender offer for all remaining Resorts Class B stock at $135 per share. Trump did so to comply with the terms of his agreement with the Crosby estate. By the closing of the offer, January 11, 1988, Trump had acquired 95% of Resorts' Class B stock, representing 88% of the voting power of all of Resorts' outstanding stock. There then remained outstanding less than

claim of fraud or unfair dealing in the merger. *Cede*, at 1188, 1189.

2. On November 12, 1989, a petition for involuntary bankruptcy was filed in the United States Bankruptcy Court for the District of New Jersey against Resorts International, Inc. The bankruptcy proceedings occurred subsequent to the events forming the basis of this appeal. In accordance with 11 U.S.C. § 362(a)(1), we temporarily stayed the issuance of this opinion.

3. The New Jersey Casino Control Commission later approved the Comprehensive Services Agreement on February 24, 1988. Before final approval, however, the Commission modified the CSA to exclude terms which allowed Trump to charge a management fee for the Taj Mahal before the casino was completed and became operational.

five percent of Resorts' Class B stock and all outstanding Class A stock.

In December 1987, Trump proposed to take Resorts "private" through a squeeze-out merger of the remaining shareholders at $15 per share. At that time the market price of Resorts was $13 per share. Trump's justification for the proposed merger was his belief that private ownership of Resorts was the only viable alternative for financing and completion of the Taj Mahal. Trump's announcement triggered the filing of further shareholder suits to block the proposed squeeze-out. However, in mid-January, a special committee of the Resorts' board, comprised of the three independent outside directors, rejected Trump's $15 offer as unfair; and Trump withdrew his proposal.

By January 1988, fourteen separate class actions and derivative law suits had been filed by Resorts shareholders against Trump, the directors of Resorts, and Trump Hotel Corp. The suits charged Trump and Resorts' directors with breach of fiduciary duty and waste of corporate assets in agreeing to the terms of the Comprehensive Services Agreement. The suits also charged Trump with unfair dealing with the minority Class A shareholders in his $15 squeeze-out merger proposal to take Resorts private.

Settlement discussions followed; and on January 31, 1988 the parties (plaintiffs' Class A counsel and Trump's representatives) executed a memorandum of understanding intended to settle the pending litigation. The memorandum led to a proposed "Agreement of Merger and Original Settlement," which Resorts' special committee and its board of directors approved. In general, it provided that all pending suits would be dismissed in consideration of Trump's increasing his all-cash tender offer for all remaining Class A and B shares from $15 to $22 per share, followed by a cash-out merger at the same price. Shortly thereafter, Trump commenced a tender offer at $22 per share for all outstanding Class A and B shares of Resorts; and a court hearing on the proposed plan of merger was scheduled for March 18.

On March 17, 1988, Merv Griffin formally entered the fray. Griffin presented Resorts' board with a $35 per share conditional tender offer for all of Resorts' outstanding shares. His offer was conditioned upon: (1) Trump's agreeing to vote his Class B shares in favor of a Griffin merger; and (2) Trump's agreeing to cancel the CSA. When Trump and Resorts' special committee both rejected Griffin's offer, the highly publicized Griffin/Trump battle for control of Resorts ensued.

Negotiations between the Griffin and Trump forces followed, later joined in by representatives of the shareholder plaintiffs. The negotiations led to an all-party settlement on May 27, 1988 of the then pending Delaware suits, by then consolidated. The terms of the denominated "Amended Settlement" called for dismissal with prejudice of all claims arising from the takeover efforts of both Trump and Griffin. In return, the party plaintiffs and defendants agreed to Trump and Griffin undertaking the following sequential actions: (1) Griffin would make a tender offer for all publicly owned outstanding Class A shares of Resorts at $36 per share; (2) Resorts would sell the Taj Mahal casino and related assets to Trump for $250,000,-000 and Resorts would pay Trump Hotel Corp $63,700,000 for release of Resorts from the CSA; (3) Trump would sell to Griffin his 712,650 Class B shares at Trump's purchase price of $135 per share; and (4) Griffin and Resorts would effect a merger, with the remaining Resorts shareholders cashed out at $36 per share.

After Resorts' special committee's investment bankers opined that the $36 tender offer was fair, Resorts' special committee of independent directors approved the merger on June 2. Five days later, Griffin commenced his tender offer for Resorts' shares at the agreed tender price of $36.

On July 12, the day the proposed Amended Settlement was filed with the court, plaintiff David Dion, a nontendering Resorts Class A shareholder, filed the fifteenth and final Delaware shareholder

suit.[4] Asserting what he denominated as a *"Rabkin/Cede"* complaint, Dion challenged both the fairness and timing of the Trump/Griffin second transaction. Dion purported to sue to protect his right as a dissenter under *Rabkin v. Philip A. Hunt Chemical Corp*, Del.Supr., 498 A.2d 1099 (1985), to assert a claim of fraud in the merger. (*See* n. 1.)

On July 14, 1988, the Court of Chancery certified the Delaware suits for hearing and settlement as class and derivative actions not subject to opt-out, pursuant to Court of Chancery Rules 23.1, 23(a), and 23(b)(1) and (2); and the court directed that the required notice of hearing be given all Resorts' shareholders of record from November 6, 1987, through the date of merger.

Following settlement hearing on August 18 and presentment of the claims of eight shareholder objectors (four Class A and four Class B), the Court of Chancery approved the Amended Settlement. On the evidence presented, the court found no basis to conclude that the Resorts' board, acting through its special committee, was either interested or had acted other than in good faith and in an informed manner. Therefore, the court ruled that the business judgment rule applied to the challenged actions of Resorts' board, including: (1) the board's proposed sale of the Taj Mahal to Trump Hotel Corp; and (2) the board's proposed payment to Trump Hotel Corp for release and cancellation of the CSA. Further, the court found it "doubt-

ful" that any of the objectors could later meet their burden of proving the committee had acted either with gross negligence or without good faith in authorizing either transaction. The court also found the Griffin Company's tender offer price of $36 to Resorts' minority shareholders to be "both generous and fair." Finally, the court found the several derivative and class actions to have been properly certified under Court of Chancery Rules 23.1 and 23(a) and (b), and the proposed settlement and judgment to be binding on all shareholders, Class A and Class B, except those Class B shareholders who had not tendered their shares and who had timely perfected their appraisal rights.

By further rulings, the court found that Dion, Lowenschuss, and other nontendering Class A shareholders had been adequately represented by the tendering Class A representatives and hence were bound by the terms of the settlement. In contrast, the court excluded the nontendering Class B shareholders by permitting them "to opt out of the class and not be bound by the [settlement and] judgment." The court did so in the belief that the Class B nontendering shareholders were not adequately represented by the representatives of the Class A plaintiffs and that the interests of the Class A and Class B shareholders were not necessarily identical.[5] However, the court limited the Class B shareholders' right to assert *Rabkin* claims to their future appraisal remedies (rather than to assert independent claims of fraud in the

---

**4.** By then, two related lawsuits attacking both transactions had been filed in the United States District Court for the District of New Jersey, one action in March and the other in June, 1988. Both actions charged Trump and Resorts with violation of section 14(e) of the Securities and Exchange Act of 1934. Both actions also charged Trump and Resorts' board with breach of fiduciary duty involving both Trump's activities and the terms of the ultimate Trump/Griffin merger. Pursuant to a stipulation of counsel and court order entered in both of the New Jersey suits, the parties agreed to be bound by the terms of the Delaware "Amended Settlement"; and the plaintiffs in the New Jersey suits were included within the class certified by the Court of Chancery.

**5.** The court found that the interests of the Class A and Class B shareholders had been rendered

materially identical and "functionally equivalent" through Trump's acquisition (and later sale to Griffin) of over 95% of the outstanding Class B shares, and further noted that the two classes had always traded "essentially at the same price." Nevertheless, the court concluded that the nontendering Class B shareholders *might* possibly be entitled to a higher price on appraisal than the Class A shareholders. The court relied principally upon Trump's offer of $135 per share six months earlier for all outstanding Class B shares and the fact that no Class B shareholder was among the plaintiff shareholder class representatives. *In re Resorts International Shareholders Litigation*, Del.Ch., C.A. No. 9470, Hartnett, V.C., 1988 WL 92749 (Sept. 7, 1988).

merger) and presumed that such an appraisal remedy would be forthcoming for such shareholders at the time of Griffin's cash-out merger of the remaining Resorts' shareholders. In the court's view, it would be "manifestly unfair for the Class B stockholders to both receive the $36 and then retain a right to bring a future lawsuit."

## II

We now address the contentions of the objector appellants.

### A. The Class A Objectors

Objectors Dion and Lowenschuss raise on appeal multiple common arguments. First, they attack the Amended Settlement as being of no benefit, as well as unfair, to dissenting Class A shareholders. *See Selfe v. Joseph,* 501 A.2d at 411. They state: (1) that no consideration passed for the settlement of Dion's suit; and (2) that the interests of the tendering Class A shareholders diverged from the interests of the nontendering objectors. Therefore, these Class A objectors contend that their interests are not fairly represented by the Class A shareholder settlement representatives, whose sole objective was to obtain the maximum available tender offer price per share. Second, Dion and Lowenschuss contend that it is unfair to bar nontendering Class A shareholders seeking appraisal rights from independently pursuing *Rabkin/Cede* claims when the court has preserved (in a limited way) such claims for nontendering Class B shareholders who have elected appraisal. Third, they attack not only Griffin's acquisition of Resorts but Resorts' sale of the Taj Mahal to Trump and Resorts' payment to Trump Hotel Corp for its release from the CSA. While Dion seeks to overturn the settlement, Lowenschuss seeks to opt out of the class and not be bound by the settlement.

Dion's suit principally focuses on the Amended Settlement, claiming it to have been a Griffin–Trump "engineered deal" to "carve up" Resorts. Dion challenges the sequential timing of the elements of the proposed Amended Settlement [not the settlement as effected] as intended to diminish the value of dissenters' appraisal remedy. Dion also argues that defendants reversed the sequence of their initial plan of selling off Resorts' assets before merging out the minority interests in order to moot his *Rabkin* claim. Finally, Dion contends that the court's refusal to allow him to depose the class defendants (in pursuit of his attack on the second transaction) was an abuse of discretion, requiring rejection of the Amended Settlement, under *In re Amsted Industries, Inc. Litigation,* Del.Ch., 521 A.2d 1104 (1986). On these grounds, Dion asserts that the record did not support dismissal, or compromise, of his suit; and the Court of Chancery should have permitted both him and Lowenschuss to pursue *Rabkin* claims in addition to their appraisal rights.

### B. The Class B Objectors

The Class B objectors (who do not purport to represent a class) premise their appeals upon the fact that they have not tendered or perfected their appraisal rights. They point to the expiration of their appraisal rights on the date of the Griffin/Trump merger, August 30, 1988, which occurred prior to the issuance of the court's opinion, September 7, 1988. They complain that their right to opt out is illusory because it is tied to an appraisal remedy that is unavailable to them. The Class B objectors contend that the trial court should have permitted them to assert *Rabkin* claims independent of any appraisal recourse. Finally, the Class B objectors assert that they were denied an opportunity either to contest the certification of the class or to opt out, contrary to law.

## III

Before turning to the issues, we briefly restate the standard of review of shareholder class or derivative settlements applicable to both the trial court and this court on appeal. An appellate court's duty is to recognize the unique role played by the trial court in these settlements. Although Delaware law favors settlement of issues which have been voluntarily agreed

upon by the parties, *Rome v. Archer*, Del. Supr., 197 A.2d 49, 53 (1964), the Court of Chancery must nevertheless play the role of fiduciary in its review of these settlements and accordingly must engage in more than a cursory examination of the facts underlying each settlement. *Id.* All challenges to the fairness of the settlement must be considered, but in so doing the trial court is under no obligation to actually try the issues presented. *Barkan v. Amsted*, 567 A.2d at 1283. In essence, the trial court's function is to exercise its business judgment in deciding whether the settlement is reasonable in light of the factual and legal circumstances of the case. *Polk v. Good*, Del.Supr., 507 A.2d 531, 535 (1986). "While the Court of Chancery is under a duty to be probing in its consideration of the issues raised by a settlement, the Court is also vested with considerable discretion." *Barkan*, at 1284.

■ This Court's review of an appeal from a class or derivative settlement is, in turn, predicated on the trial court's considerable discretion. Our role is solely to examine the findings of the trial court for errors of law or clear abuse of discretion in its determination of the reasonableness of the settlement. *Polk* at 536; *see also Nottingham Partners v. Dana*, Del.Supr., 564 A.2d 1089, 1102–03 (1989). In this examination, an appellate court plays a limited role in assessing the terms of the settlement, *Barkan*, at 1284. We do not exercise our own business judgment of the intrinsic fairness of the settlement. If we, after review of the entire record, find that the rulings of the trial judge are supported by the record and are the product of an orderly and logical deductive process, those rulings must be accepted. *Levitt v. Bouvier*, Del.Supr., 287 A.2d 671, 673 (1972).

### A. The Class A Objectors

■ Dion and Lowenschuss' principal contentions are that their interests as nontendering Class A shareholders (seeking to assert *Rabkin/Cede* claims, as well as to elect their appraisal rights) are not fairly represented by the Class A representatives whose only interest is in tendering for max-

imum value. The trial court found to the contrary. The court reasoned that "[t]he interests of all the Class A shareholders are the same in that they all desire to maximize the value of their investments." The court noted that Griffin's $36 per share offer represented "almost a 64% premium over Trump's [final] $22 offer" and represented nearly three times the market price of Resorts' shares immediately prior to November 1987 and without any improvement in Resorts' "precarious financial condition" to justify such a price increase. On this reasoning the court concluded that Griffin's tender offer for the remaining minority shares was "both generous and fair." *In re: Resorts International Shareholders Litigation*, C.A. No. 9470, slip op. at 14, 15. We find both the court's reasoning and its conclusion to be correct.

■ Any Class A shareholder who believed that the $36 offer was inadequate could timely exercise his/her statutory right of appraisal—a right which was not impeded by the Amended Settlement. *Cede & Co. v. Technicolor, Inc.*, Del.Supr., 542 A.2d 1182, 1186 (1988); *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701, 712–13 (1983). As the trial court correctly pointed out, the Class A objectors were in essence asking that they, as nontendering shareholders with the option of electing appraisal, also be given the right, in default of a timely election, to disrupt a class settlement. Since such settlements are ordinarily conditioned on the abandoning of all derivative and class claims for relief, to grant objectors the relief requested would, as the trial court realistically pointed out, "virtually derail any settlement" of a class action "to the detriment of all of the members of the class." Such a result has no legal precedent under Delaware law and would act to the detriment of shareholder classes as a whole.

■ The Class A objectors' contention that they were unfairly denied their right to pursue *Rabkin/Cede* fairness claims misapplies Delaware law and has no support in the record. The trial court properly found that the contested transactions of the Griffin/Trump merger agreement had

been approved by an independent and disinterested special committee and therefore would be accorded the presumption of the business judgment rule's application. *Grobow v. Perot*, Del.Supr., 539 A.2d 180, 187 (1988); *Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858, 872 (1985); *Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 812 (1984). Accordingly, without some substantiated evidence of bad faith or gross negligence, any effort to set aside these transactions in a full evidentiary hearing would likely fail. *Van Gorkom*, 488 A.2d at 872. Objectors failed to come forward with any evidence to rebut the business judgment rule's application to the challenged transactions.

The hearing record also refutes Dion's related assertion that his suit claims of self-dealing and waste of corporate assets were not fairly considered by the trial court at the settlement hearing. The record clearly shows that the trial court carefully considered the parties' contentions in the context of the panoply of events. Those included the terms of the ultimate Trump/Griffin merger agreement and Dion's claim that Resorts' sale of its assets to Trump and its payment to terminate the Comprehensive Services Agreement were timed to reduce an appraisal recovery. *In re: Resorts International Shareholders Litigation*, slip op. at 13, 21.[6] Additionally, the trial court expressly found no evidence that the Resorts board's special committee's approval of the two sale and release transactions was lacking in good faith or was uninformed. The Resorts' special committee was concededly composed of wholly disinterested outside directors having no ties to Trump or Griffin. Under Delaware law, the possibility that the actions of the disinterested special committee could be successfully challenged was less than doubtful. *Van Gorkom*, 488 A.2d at 872. Therefore, it was not substantively unfair for the court to bar Dion's eleventh hour claims of unfair dealing in the arms-length negotiation of the Amended Settlement.

▇ We turn to the Class A objectors' contention that they received "no benefit" from the Amended Settlement and therefore should not be bound by the settlement. *Selfe*, 501 A.2d at 411. In *Selfe*, this Court found, on analogous facts, that a nontendering shareholder had received a *benefit* from a settlement which provided an increase in a merger price per share from $58 to $60, in return for release of all claims. The Court found that the option of receiving $60 was a distinct benefit that was not negated by the fact that shareholders could either elect to receive it or seek their appraisal remedy. Without the settlement, there was no assurance of a $60 offer, and that assurance constituted a benefit to all shareholders regardless of their ultimate election to tender or seek appraisal.

The facts in the present case are even more compelling. The Amended Settlement afforded Resorts' minority shareholders with a $36 per share offer, a 64% increase of $14 over Trump's highest offer of $22 per share. Objectors' contention that the nontendering shareholders who elected appraisal received no benefit from the settlement is fallacious.[7] As this Court stated in *Selfe*, "It is clear that no settlement fund of this magnitude would have been created for the benefit of objector's subclass if any of the underlying claims for release were permitted to survive for assertion under section 262." *Selfe*, 501 A.2d at 411. Additionally, in this case, the Court of Chancery specifically determined that the objectors' *Rabkin/Cede* claims, if allowed to survive at all, could only proceed with a very heavy presumption against them because the events complained of had

---

6. Dion's claim that the transfer of the Taj Mahal and payment for cancellation of the CSA were timed to strip Resorts of valuable assets was shown to be factually unsupportable. The fact is that both the transfer of the Taj Mahal to Trump and the payment for cancellation of the CSA occurred the day after the merger, not before the merger, as Dion alleged. Dion's un-

fairness claims related to timing of the transaction therefore are mooted.

7. Additionally, in *Polk v. Good*, we noted that the "[v]alidity of a settlement does not depend on every compromised claim in a lawsuit being supported by independent consideration." 507 A.2d at 538.

been approved by a disinterested board. In sum, we cannot find a clear abuse of discretion in the Court of Chancery's finding that the Class A objectors had received a benefit from the Amended Settlement.

■ We turn to objector Dion's final contention that the court's refusal to permit him to depose the defendants denied him permissible discovery under *In re Amsted Industries, Inc. Litigation,* 521 A.2d 1104 (limited discovery into settlement negotiations is appropriate prior to a hearing on a class action settlement agreement). Dion asserts that the trial court's restriction on discovery was in violation of *Amsted* and *In re General Motors Corp. Engine Interchange Litigation,* 7th Cir., 594 F.2d 1106, *cert. denied,* 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979) (allowing limited discovery of class counsel to assist the court in fulfilling its duties owed all class shareholders of determining that settlement negotiations were conducted in good faith). *Fins v. Pearlman,* Del.Supr., 424 A.2d 305, 308 n. 4 (1980). The record does not support a finding that the trial court abused its discretion in its ruling limiting discovery. In an oral ruling dated August 3, 1988, Dion was permitted to depose both of plaintiffs' co-counsel for the class settlement. The court informed Dion that it would consider further applications for discovery dependent upon a showing of good cause; and Dion made no further application to the court. On this record, we find no merit to Dion's claim. *See Amsted,* 521 A.2d at 1108.

■ Class A objector Lowenschuss asserts multiple arguments, none of which withstand analysis. First, he asserts that because he holds stock in trust as a fiduci-

ary for a pension plan, his primary interest was to remain a shareholder and maximize long-term value. This Court long ago rejected the concept that a shareholder has an absolute right to remain a shareholder in the face of an otherwise legislatively recognized procedure for effecting a cash-out merger. *See generally* E. Folk, R. Ward, E. Welch, *Folk on the Delaware General Corporation Law,* § 251.4 (2d ed. 1988).

■ Lowenschuss also contends that the trial court's limited opt-out granted Class B shareholders but not afforded the Class A shareholders is unfair. He misunderstands the Court of Chancery's reason for excluding the nontendering Class B shareholders from the Amended Settlement. While the trial court found a practical identity of interest between Class A and Class B shares,[8] the court, in an admitted "close call," excluded nontendering Class B shareholders from the binding settlement out of a belief that Resorts' Class B shareholders had possibly divergent interests from its Class A shareholders. Because no Class B representatives had participated in the settlement negotiations, the court was concerned over a possible divergence of interest.[9] Under these unusual circumstances, the court made a special, narrow exception to permit any Class B shareholder who had perfected his appraisal rights to opt out of the settlement. The court did so only to avoid foreclosing possible future claims, however weak, resulting from divergent interests.

While there may be room for argument on this "close call," we will not reverse in the absence of any finding of abuse of discretion by the court below. *See Nepon-*

---

**8.** The Court of Chancery recognized that Class A and Class B shares were identical in all respects except that Class B shares have 100 times the voting power. But since Donald Trump owned a controlling block of Resorts shares, all remaining Class A and Class B shares had the same rights (or lack of rights) in voting power. Therefore, as a practical matter, A and B shares were of equal value; and holders shared the same interest with respect to their shares.

**9.** Factors pointing to a possible divergence in interests of Class A and B shares included: (1)

during late 1987 and early 1988, Trump had offered $135 for Class B shares and only $15 for Class A shares; (2) under the terms of the Amended Settlement, Trump would receive $135 for the sale of his Class B shares to Griffin while other Class B shareholders would receive $36 or appraisal; (3) an increased settlement for Class B shares could correspondingly decrease the funds available to settle Class A shares—and only Class A shareholders were present to represent the class.

*sit Inv. Co. v. Abramson,* Del.Supr., 405 A.2d 97 (1979). We decline to find the court to have abused its discretion in binding objector Lowenschuss to the Amended Settlement, especially in light of the fact that the settlement did not alter his right to seek appraisal.

### B. The Class B Objectors

■■■ Before addressing the Class B objectors' claims, we restate the trial court's findings and rulings concerning the non-binding effect of the settlement as to the Class B minority shareholders. While the court found those shareholders not to have "divergent economic interests" from the Class A public representatives, the court concluded that the Class B shareholders should not be bound by the terms of the Amended Settlement unless they had accepted the benefits of the settlement by tendering to receive the $36 per share offer by Griffin. Under the court's Order and Final Judgment, the court thereby decreed:

> These claims (the "Settled Claims") are hereby compromised, settled, released and dismissed with prejudice by virtue of the proceedings herein and this Order and Final Judgment, except that nothing herein shall affect the rights of holders of Class B Common Stock of Resorts International, Inc., who perfect their right to appraisal of their shares pursuant to 8 *Del. C.* § 262 and who do not accept the merger consideration for their shares to assert the Settled Claims in an appraisal action.

The principal argument of the Class B objectors (who neither tendered nor perfected their appraisal remedy) is that the limited opt-out provided them by the trial court—to assert any *Rabkin* claims in their appraisal remedy proceeding—is illusory. They contend that the court abused its discretion, if not erred as a matter of law, in not providing them with a further alternative: to assert *Rabkin* claims of fraud or unfair dealing in the merger in an independent action.

Under the facts of this case, we think that the choice provided the Class B shareholders either to tender or seek their appraisal remedy was clearly consistent with *Weinberger.* 457 A.2d 701. Moreover, we find the choice to be their exclusive remedy, in the absence of record evidence that their claims came within the *Cede* exception (dissenting shareholders lacking apparent knowledge of a claim of fraud in the merger at time of electing their appraisal remedy are not precluded from independently asserting a later-discovered *Rabkin* claim of fraud in the merger). 542 A.2d at 1188. The Class B objectors were provided the choice given any shareholder in a cash-out merger: either to accept the merger terms or to seek an appraisal.

The court below cannot be blamed for the failure of the objectors to make a timely election of their statutory appraisal remedy. The consummation of the Amended Settlement was conditioned upon the minority shareholders' accepting the $36 tender offer and not more than 7.5% of the Class A and Class B shareholders seeking their appraisal remedy. The Class B objectors' failure to exercise such alternative remedies is no basis for providing them with yet another option: to seek to pursue *Rabkin* claims after failing to make a timely appraisal election. The Class B objectors' exercise of their option, to either tender or seek their appraisal rights, cannot be permitted to be tolled until the final disposition of a Rule 23 derivative or class action settlement. Therefore, we find no error of law, unfairness or abuse of discretion in the trial court's treatment of the Class B shareholders under the Amended Settlement. *Neponsit,* 405 A.2d at 101. We conclude that the Class B objectors had due notice of the impending August 30 merger and, therefore, adequate time within which to either tender or elect their appraisal remedy.

■■■ Finally, the Class B shareholders make a due process argument that certification of the class as a non-opt-out class constitutes an error of law. However, since the amended complaint sought primarily equitable or injunctive relief, the court's certification of the class action, pursuant to Court of Chancery Rule 23(b)(1)

and (2), was entirely appropriate, that is, as a non-opt-out class. *Nottingham,* 564 A.2d 1097–1101. It is clear from the record that timely notice was given all Resorts' shareholders, Class A and Class B, on July 15, 1988, of certification and the proposed "Amended Settlement." Hence, there is no merit to the asserted due process claim. *Nottingham,* 564 A.2d at 1101; *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 812, 105 S.Ct. 2965, 2974, 86 L.Ed.2d 628 (1985).[10]

\* \* \*

Affirmed.

**10.** "If the forum State wishes to bind an absent plaintiff concerning a claim for money damages or similar relief at law, it must provide minimal procedural due process protection. The plaintiff must receive notice plus an opportunity to be heard and participate. The notice should describe the action and the plaintiffs rights in it." *Shutts* 472 U.S. at 811–12, 105 S.Ct. at 2974 (footnote and citations omitted).