Benyamin TAYLOR Plaintiff,

v.

CITY OF NEW YORK, Sgt. James Ryan, Sgt. Charles Trentacosta, P.O. Murray, Det. Povermo, Det. Bobbet, Det. Cummings, Undercover # 11012, Undercover # 7604, and Does1–10 Defendants.

No. 01–CV–5750 ILG.

United States District Court, E.D. New York.

June 23, 2003.

Jon L. Norinsberg, Gottlieb, Rackman & Reisman, New York City, for Benjamin Taylor.

Deborah I. Meyer, Assistant Corporation Counsel, Corporation Counsel of the City of New York, New York City, for City of New York.

*MEMORANDUM AND ORDER*

GLASSER, District Judge.

This civil rights action arises out of the arrest and prosecution of plaintiff Benyamin Taylor for purportedly selling narcotics in Coney Island, Brooklyn. Following a bench trial, plaintiff was acquitted of the charges. Plaintiff thereafter brought suit against the City of New York and a number of the police officers involved in the arrest for violations of his civil rights in connection with the arrest and prosecution.

Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. At oral argument plaintiff conceded his claims against the City of New York as well as individual defendants Murray, Povermo, Bobbet, and Cummings were without merit, and therefore the motion is granted as to those defendants. As to UC–7604, Trentacosta, Ryan, and Robinson, the motion is denied because genuine issues of fact remain in dispute.

## BACKGROUND

Only some of the facts can be said to be undisputed. According to Defendants' Rule 56.1 statement (which is accepted unless unsupported by the record or properly disputed by plaintiff), buy money is money used by undercover police officers to purchase narcotics. On November 1, 1999, at about 5:45 PM Sergeant Trentacosta gave seven ten-dollar bills to Sergeant James Ryan as buy money to prepare for use during "buy and bust" operations that day.[1] The money came from a fund kept at the precinct. Ryan prepared the money by photocopying the bills with the serial numbers visible and marking the date and time and to whom the bills would be given. After this prerecorded buy money was photocopied, Ryan gave either all or some (the dispute raised by plaintiff over this fact is not

material) of these bills to UC–11012 (apparently Detective Robinson).[2]

At 8:00 PM that night, Trentacosta met with his narcotics team to decide which areas of South Brooklyn to cover that night. Since the area in front of and around 2945 West 23rd Street was a well-known drug buy location, it was chosen as the first stop of the team's tour. At about 8:15 PM that night plaintiff was sitting on one of the benches to the right of the entrance to 2945 West 23rd Street.

While sitting on the bench, Taylor began speaking to someone he knew by the name "D."[3] "D" appears to be the only male person to whom plaintiff spoke during this time period. About this time, Robinson (who was acting as the undercover "ghost" responsible for safety of the undercover team) observed UC–7604 part ways with a suspect and signal that a successful drug buy had occurred. However, a material dispute exists whether UC–7604 met with Taylor at all, and thus whether Taylor was the suspect in question.

UC–7604 and Robinson met at the corner of Surf Avenue and West 23rd Street. UC–7604 and Robinson then informed Trentacosta via Robinson's transmitter that a buy had occurred. UC–7604 described the suspect as "a black male, approximately 27 to 30, wearing a dark Nike jacket, with a baseball cap turned backwards with some strange, Chinese-like writing on it, in front of 2945 West 23rd

1. Although plaintiff denies the factual evidence set forth in paragraph 2 of the Rule 56.1 statement (*see* Pl. Resp. to Def. R. 56.1 St. ¶ 2), the Trentacosta deposition cited for that paragraph makes it clear that he gave the bills to Ryan and that the money was buy money for that day's operations. (Trentacosta Dep. at 42–45.)

2. An independent review of the record reveals that UC–7604 at trial identified that UC–11012 was the "ghost" for the operation that night (Trial Tr. Aug. 15, 2000, at 192), and

Robinson stated in his deposition that he was the "ghost" that night. (Robinson Dep. at 34.)

3. Defendants claim that "D" was actually UC–7604, but point to no part of the record to support this statement. Similarly, plaintiff claims that "D" was an African–American male, and not a light-skinned Hispanic like UC–7604 apparently is (*see* UC–7604 Dep. at 25), but plaintiff offers no evidence to support the assertion that "D" is African–American.

Street." (Def. R. 56.1 St. ¶ 15.) At the criminal trial that followed his arrest, Taylor admitted that he was wearing an outfit matching this description on November 1, 1999, although he denied that he was wearing the baseball cap at the relevant time period after 8 PM (having taken it off while eating dinner). However, it should be noted that Justice Michael R. Juviler (since the case was tried before the judge and not a jury) held in his verdict that this description was problematic since it could not be corroborated by any contemporaneous records and that "the description rests on testimony of officers which has already been shown to have been subject to significant doubt." (Trial Tr. Aug. 24, 2000, at 90.)

UC–7604 and Robinson then went to their car, where UC–7604 placed four bags of crack cocaine into an evidence envelope and marked the envelope with the location, time and date of the buy, the mark "J.D. [John Doe] Baseball cap," and the time of sealing the envelope.[4]

Meanwhile, after receiving Robinson's broadcast of the description, Trentacosta informed his team and they moved in to the benches in front of 2945 West 23rd Street. Trentacosta and Ryan arrived first and found plaintiff in that area. It is undisputed that Trentacosta and Ryan approached plaintiff and placed him under arrest. There is a genuine dispute, however, as to whether plaintiff was arrested and handcuffed soon after being thus approached or only after being identified by UC–7064 in a drive-by identification. (*Compare* Trentacosta Dep. at 34 (stating that handcuffs used only after body search and drive-by ID) *with* Taylor Dep. at 31–

33 (describing being cuffed prior to body search and ID).)

At the time plaintiff was arrested, his pockets and personal belongings were searched at the benches in front of 2945 West 23rd Street, and his personal belongings were placed in an envelope. Trentacosta took the envelope and carried it back with them in the police vehicle to the precinct house. At the precinct, Trentacosta and Ryan sat at a table and went through plaintiff's personal belongings to determine if there was any contraband. After checking the belongings, Trentacosta took plaintiff's keys and filled out a voucher.

Trentacosta also compared plaintiff's money to the photocopy prepared beforehand of the pre-recorded buy money. Trentacosta states that he found four $10 bills which serial numbers matched those of the pre-recorded buy money and vouchered one of those $10 bills while returning the remaining $30 to the precinct fund. Plaintiff disputes this evidence and points to his own testimony that he possessed only between eleven and fifteen dollars on his person that day (from which it could be inferred that even if Trentacosta did find four $10 bills they could not have come from plaintiff). (Trial Tr. Aug. 18, 2000, at 485.) Plaintiff's personal property then was returned to him (except for his keys).

While plaintiff was being arrested and taken to the precinct, UC–7604 went to the team base, which was at a different location than the precinct. UC–7604 waited at the base until Trentacosta arrived before opening his evidence envelope, which contained a substance they field tested and identified as crack cocaine.

---

4. Plaintiff states that he never had any interaction with UC–7604 and did not participate in any drug transaction on November 1, 1999. Thus, although there is no dispute that the drugs were vouchered, whether UC–7604 ever met plaintiff that night and whether he obtained the crack cocaine in question from plaintiff remains in dispute.

Plaintiff later testified before and was thereafter indicted by a grand jury for criminal sale of a controlled substance on or near school grounds, criminal sale of a controlled substance in the third degree, and criminal possession of a controlled substance in the third and seventh degrees. Ryan and UC–7604 also testified before the grand jury.

After a bench trial, plaintiff was acquitted. In explaining the verdict, Justice Juliver noted that "[t]he trier of fact was faced with two irreconcilable versions of the events in question. Each version was rational." (Trial Tr. Aug. 24, 2000 at 80.) Justice Juliver went on to note the "many, many facts in this case" that contributed to reasonable doubt about Taylor's guilt. (*Id.* at 83.) For example, the court noted that the prisoner property envelope cover sheet (which would have shown the location, time and property recovered from Taylor) was missing, the security envelope containing the pre-recorded buy money and the $94 dollars allegedly recovered was not produced, and the money itself was not produced. (*Id.* at 85–86.)

In support of its motion, defendants argue that it is undisputed that probable cause existed to justify the arrest and prosecution of plaintiff; that the grand jury indictment creates a presumption that probable cause existed; that defendants have qualified immunity for their actions; and that the plaintiff has failed to establish any of the elements of the state law claims of intentional infliction of emotional distress, negligent hiring and retention by the City of New York, and negligent training and supervision by the City of New York.

Plaintiff opposes the motion, but only addressed in his papers the first two arguments and did not address the liability of defendants Bobbet, Murray, Cummings and Povermo or of defendant City of New York or whether he can establish any of the elements of the state law claims mentioned before. As noted above, plaintiff conceded at oral argument that summary judgment was appropriate for his claims against Bobbet, Murray, Cummings and Povermo as well as the City of New York.

## ANALYSIS

Summary judgment "shall be rendered forthwith if the pleadings, depositions ... together with the affidavits ... show that there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). A "moving party is entitled to judgment as a matter of law [if] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotation marks and citations omitted). In deciding a summary judgment motion, a court should not resolve disputed issues of fact; rather, it simply must decided whether there is any genuine issue to be tried. *Eastman Mach. Co. v. United States,* 841 F.2d 469, 473 (2d Cir.1988). A disputed fact is material only if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant such that a reasonable jury could return a verdict in her favor. *Id.,* at 248–49, 106 S.Ct. 2505. "In assessing the record to determine whether there is a genuine issue of fact, the court is required to draw all inferences in favor of the party against whom summary judgment is sought." *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989).

## I.  Plaintiff's § 1983 Claims

Plaintiff's first claim for relief alleges that the individual police officers acting under color of law deprived him of his civil rights guaranteed by the United States Constitution.  These alleged deprivations are of two types: false arrest and malicious prosecution.

### A.  Necessity of probable cause

█ "A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996).  "To prove the elements of false arrest under New York law plaintiff must show: (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994).  An officer is privileged to make an arrest if he or she has probable cause to do so.  *See* N.Y.Crim. Proc. § 140.10(1)(a) & (b).  The presence of probable cause is therefore a complete defense to an action for false arrest whether that action is brought under state law or under § 1983.  *Weyant,* 101 F.3d at 852.

█ Probable cause exists "when the arresting officer has knowledge or reasonable trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Singer v. Fulton County Sheriff,* 63 F.3d 110, 118–19 (2d Cir.1995).  Probable cause may exist even if the officer is acting upon mistaken or false information as long as the officer reasonably relied upon the source of that information.  *Bernard,* 25

F.3d at 102.  However, " 'evidence of a subsequent dismissal, acquittal or reversal on appeal would be admissible to refute justification' " of probable cause.  *Weyant,* 101 F.3d at 852 (*quoting Broughton,* 37 N.Y.2d at 458, 373 N.Y.S.2d at 95, 335 N.E.2d at 315) (ellipses omitted).  "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers, or may require a trial on the merits if the facts are in dispute." *Id.*

█ Similarly, a claim for malicious prosecution under § 1983 also requires that the plaintiff show a "lack of probable cause for commencing the proceeding." *Russell v. Smith,* 68 F.3d 33, 36 (2d Cir. 1995).  However, the fact that plaintiff was indicted by the grand jury creates a presumption that probable cause did exist for purposes of prosecution, and that presumption can be rebutted only by evidence of fraud, perjury or deliberate and intentional suppression of evidence before the grand jury.  *Fulton v. Robinson,* 289 F.3d 188, 198 (2d Cir.2002).  The grand jury presumption only applies to malicious prosecution claims, and "has no application to false arrest claims ...." *Mejia v. City of New York,* 119 F.Supp.2d 232, 256 (E.D.N.Y.2000); *see Broughton v. State,* 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 93, 335 N.E.2d 310, 313 (1975) (presumption of validity "applies only in causes of action for malicious prosecution and is totally misplaced when applied in false imprisonment actions.").

█ Against this backdrop, it cannot be said there is no dispute as to whether probable cause existed to arrest plaintiff.  Although the officers' testimony is relatively consistent with one another and would provide evidence that UC–7604 bought crack cocaine from plaintiff and

accurately transmitted his description to the other officers who effected the arrest, plaintiff's version of events is quite different, and he denies selling crack cocaine to UC–7604 that night. There are essentially two version of events—plaintiff testifies that he never sold drugs to UC–7604 while UC–7604 states that plaintiff sold him 4 bags of crack cocaine.

Additionally, plaintiff's story was credited at least somewhat by Justice Juliver, who acquitted plaintiff of the charges resulting from the arrest. Although the acquittal would be admissible to attack the underlying basis for the arrest, *see Weyant, supra,* this Court is also aided by the fact that Justice Juliver took care to note for the record, among other things, that (1) the police had misplaced much of the physical and documentary evidence (which they had a duty to preserve) that would normally support their version of events, (2) the police were unable to find the stash of drugs from which plaintiff purportedly made the sale, and (3) that the judge personally had "significant doubt" about the testimony of the officers who appeared before him and that therefore the "matching descriptions" were of "little significance." (Trial Tr. Aug. 24 at 90.) Although these judicial findings were made in a different evidentiary context and therefore would not preclude finding against plaintiff after a weighing of the evidence, they are certainly sufficient to cast doubt upon the defendants' credibility.

■■■ Defendants argue that the grand jury indictment creates a presumption of probable cause with regard to the malicious prosecution claim. However, as even defendants admit, the grand jury presumption would be rebutted if a trier of fact were to find that evidence of fraud, perjury or deliberate and intentional suppression of evidence before the grand jury led to the indictment. Plaintiff's opposi-tion to summary judgment is thus not "unsupported conclusions that witnesses perjured themselves," but rather direct evidence from his own testimony under oath at deposition. If the trier of fact were to credit plaintiff's version of events, he or she could find that the police witnesses had perjured themselves or otherwise testified untruthfully before the grand jury.

## B. Qualified Immunity for Individual Defendants

■■■ In general terms, the qualified immunity defense "hold[s] that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 817–18, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). To overcome the qualified immunity defense, a plaintiff must first "allege a violation of a clearly-established constitutional or statutory right. Second, qualified immunity will be denied only if a reasonable official should have known that the challenged conduct violated that established right." *Thomas v. Roach,* 165 F.3d 137, 142–43 (2d Cir.1999). Since plaintiff has plainly alleged a violation of a clearly established constitutional right, *Curry v. City of Syracuse,* 316 F.3d 324, 336 (2d Cir.2003), the question is whether there is any dispute over material facts as to whether plaintiff sold UC–7604 any drugs. If plaintiff did not sell any drugs to UC–7604, then without a doubt "no reasonable officer in [UC–7604's] position would have believed that it was lawful to arrest" plaintiff for drug possession or sales. *Id.* Accordingly, UC–7604 should not be entitled to summary judgment based on qualified immunity.

However, the question is not as clear cut for Trentacosta and Ryan as to the initial arrest. If they arrested plaintiff based on his description as transmitted by UC–7604 and Robinson, even if that information was false, then such an arrest would be reasonable and qualified immunity would be triggered. *See Saucier v. Katz,* 533 U.S. at 201, 121 S.Ct. 2151 ("Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause . . . and in those situations courts will not hold that they have violated the Constitution."). Thus, the question is whether it would be reasonable to rely upon UC–7604's description of the seller and arrest plaintiff based upon the fact that his appearance matched UC–7604's description.

If the matter were simply limited to the initial arrest, then Trentacosta and Ryan might be entitled to qualified immunity. However, plaintiff's claims go beyond the simple arrest to dispute directly whether any pre-recorded buy money was found on his person and to note the fact that the police lost several pieces of evidence processed contemporaneously with the arrest, as well as to note that Justice Juliver found that the officers' joint description of the purported seller was "subject to serious doubt." Taken as a whole, a reasonable factfinder could infer from plaintiff's version of the evidence that UC–7604 did not identify plaintiff as the seller and that therefore Trentacosta and Ryan should have known they had no probable cause on which to arrest plaintiff. Thus, like UC–7604, Trentacosta and Ryan also are not entitled to summary judgment based on qualified immunity.

### III. State Law Claims

Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way. *See, e.g., Douglas v. Victor Capital Group,* 21 F.Supp.2d 379, 393 (S.D.N.Y.1998) (collecting cases). On this basis alone, the court could grant summary judgment on the state law claims of intentional infliction of emotional distress, negligent hiring and retention, and negligent training and supervision. Moreover, given the lack of evidence of severe emotional distress suffered by plaintiff, or facts regarding the hiring, retention, training or supervision of its employees, summary judgment is granted on those claims.[5]

### CONCLUSION

As plaintiff concedes, summary judgment is granted in favor of the City of New York as well as individual defendants Bobbet, Murray, Cummings and Povermo. Additionally, summary judgment is granted as to the state law claims of intentional infliction of emotional distress, negligent hiring and retention, and negligent training and supervision for lack of any evidence to support the elements of those claims.

Summary judgment is denied, however, on the claims against defendants UC–7604, Robinson, Trentacosta and Ryan.

---

**5.** It is less than clear if the intentional infliction of emotional distress claim is against only the City of New York or all defendants. In either case, the claim is dismissed.