Robert Michael SHENK, derivatively
on behalf of Sirius XM Radio
Inc., Plaintiff,

v.

Melvin Alan KARMAZIN, Gary Parsons,
Joan L. Amble, Leon D. Black, Eddy
W. Hartsenstein, James P. Holden,
James F. Mooney, Jack Shaw, Gregory
B. Maffei, John C. Malone, David J.A.
Flowers, Carl E. Vogel And Vanessa
Wittman, Defendants,

and

Sirius XM Radio Inc., Nominal
Defendant.

No. 11 Civ. 2943(JSR).

United States District Court,
S.D. New York.

June 25, 2012.

Albert Morris Myers, III, Cecilia Emily Rutherford, Christopher W. Kaul, Lewis

Stephen Kahn, Melinda Ann Nicholson, Kahn Gauthier Swick, LLC, Madisonville, LA, Andrew D. Abramowitz, Daniel J. Mirarchi, Robert Mark Roseman, Spector, Roseman & Kodroff Willis, P.C., Philadelphia, PA, for Plaintiff.

Bruce Domenick Angiolillo, Jonathan K. Youngwood, Susannah Sidney Geltman, Simpson Thacher & Bartlett LLP, Robert C. Micheletto, Laura W. Sawyer, Nidhi Yadava, Todd R. Geremia, Jones Day, New York, NY, Thomas Demitrack, Jones Day North Point, Cleveland, OH, for Defendants and Nominal Defendant.

## MEMORANDUM ORDER

JED S. RAKOFF, District Judge.

In this derivative action on behalf of Sirius XM Radio, Inc. ("Sirius XM"), plaintiff Robert Michael Shenk alleges that the defendants, all of whom are either officers or directors at Sirius XM, committed certain transgressions while persuading regulators and shareholders to approve a merger between Sirius Satellite Radio, Inc. ("Sirius") and XM Satellite Radio Holdings, Inc. ("XM")that closed on July 29, 2008. Shenk also alleges that the defendants acted in their own interests, rather than those of Sirius XM, when they chose between competing refinancing transactions. Based on these allegations, Shenk initially brought claims for breach of fiduciary duty, unjust enrichment, and securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5.

In an Order dated August 31, 2011 and a subsequent Memorandum Order dated October 27, 2011, the Court granted in part and denied in part a motion by defendants to dismiss Shenk's complaint. Spe-

cifically, the Court dismissed Shenk's claims against defendants Gregory Maffei, David Flowers, Carl Vogel, and Vanessa Whitman and his claim for unjust enrichment against all defendants except John C. Malone. On February 1, 2012, Shenk voluntarily dismissed defendant Malone, thereby removing any remaining claim for unjust enrichment. *See* Stipulation of Voluntary Dismissal of Defendant John C. Malone dated February 1, 2012. After the parties completed discovery, the remaining defendants moved for summary judgment on Shenk's surviving claims and for dismissal of Shenk's complaint in its entirety. In a "bottom-line" order dated May 30, 2012, the Court granted the defendants' motion in all respects. This Memorandum Order explains the reasons for the May 30 ruling and directs the entry of final judgment.

The pertinent facts presented at summary judgment, undisputed except where indicated, are as follows.[1] For years before Sirius and XM merged, each had annually lost hundreds of millions of dollars. Defendants' Rule 56.1 Statement of Undisputed Facts ¶¶ 3, 5. The two companies began discussing a merger in early 2006. *Id.* ¶ 6. On December 5, 2006, Sirius's board hired Morgan Stanley as a financial advisor. *Id.* ¶ 8. Sirius's CEO, defendant Melvin Alan Karmazin, met with Morgan Stanley multiple times during the next three months to discuss the merger, and Karmazin gave Sirius's board reports on these meetings. *Id.* ¶¶ 9, 10. Sirius's board also received information and analysis concerning the efficiencies and cost savings that a merger with XM would produce. *Id.* ¶ 15. For example, Morgan Stanley made a presentation entitled "Strong Logic for a Merger," in which it

---

**1.** Unless otherwise indicated, citations refer to the corresponding paragraphs of both par-

ties' Rule 56.1 statements.

indicated that "[n]o other alternative transaction could generate similar magnitude of value." *Id.* ¶ 16. In the same presentation, Morgan Stanley also indicated that a combined entity could more favorably refinance each company's existing debt. *Id.* On February 18, 2007, Sirius's board unanimously agreed to pursue a merger with XM. *Id.* ¶ 19.

In March 2007, Sirius and XM filed appropriate notices with both the Department of Justice ("DOJ"), which needed to determine whether the proposed merger would diminish competition, and the Federal Communications Commission ("FCC"), which needed to determine whether the proposed merger would serve the public interest. *Id.* ¶¶ 24–25. In their application for approval from the FCC, Sirius and XM indicated that subscribers of either Sirius or XM could continue to receive their basic subscriptions to either company's channels at the same price, i.e., $12.95 per month. *Id.* ¶ 26. Sirius also indicated that the combined entity would offer subscribers other options, some cheaper than the package that each company had previously offered and some more expensive. *Id.* ¶ 28. Later in the approval process, in June 2008, Sirius and XM committed to maintaining specific pricing options for three years, although the parties dispute whether the FCC tacitly demanded such commitments, rendering them involuntary. *Id.* ¶ 41. Among other things, the companies committed to maintaining $12.95 as the price for a basic subscription to either Sirius or XM for at least three years. *Id.* ¶ 42. The FCC then approved the merger. *Id.* ¶ 46.

To obtain approval of the merger from Sirius's shareholders, Sirius issued a proxy statement. This proxy statement, like the application to the FCC, represented that Sirius believed that the merger would allow it "to offer consumers more choices and value." *Id.* ¶ 34. The proxy statement also described new options, some of which would cost more than an existing subscription, and some of which would cost less. *Id.* ¶ 36. Sirius's shareholder voted to approve the merger on November 13, 2007. *Id.* ¶ 37.

The DOJ also approved the merger, finding that the merger would not create antitrust concerns because it would not diminish competition. *Id.* ¶ 40. Specifically, the DOJ refused to define the market in which the companies competed as "limited to the two satellite radio firms" and adopted a definition of that market that considered "various alternative sources for audio entertainment." *Id.*

Three years after the merger, the FCC, having solicited and considered public comments, decided not to extend the price caps to which Sirius XM had committed. *Id.* ¶¶ 54–55. The FCC found, among other things, that Sirius XM had to compete with smartphone applications that provided mobile aural entertainment. *Id.* ¶ 56. Ultimately, Sirius XM did not raise the price of a basic subscription for forty-one months. *Id.* ¶ 58.[2] Sirius XM also did not raise prices on any of the ten new subscription packages that it offered after the merger until January 2012, honoring all of its commitments to the FCC. *Id.* ¶ 57.

On January 24, 2008, the Copyright Royalty Board ("CRB") increased royalty costs for satellite radio providers. *See* Determination of Rates and Terms for Preexisting Subscription Services and Satellite Digital Audio Radio Services, 73 Fed. Reg. 4080, 4102 (Jan. 24, 2008) (to be

---

**2.** As noted below, Sirius XM also committed in a settlement agreement to maintaining certain prices through December 30, 2011.

codified at 37 C.F.R. pt. 382); *see also SoundExchange, Inc. v. Librarian of Congress,* 571 F.3d 1220, 1223, 1226 (D.C.Cir. 2009) (identifying previous rate paid by Sirius and XM as 2.35% of revenues and approving an increase to a rate of 6%–8%). In its order approving the merger, the FCC noted that Sirius had proposed that the merged entity would begin charging a Music Royalty Fee ("MRF") in response to the CRB's new rates one year after the merger. Plaintiff's Rule 56.1 Statement of Undisputed Facts ¶ 72. Sirius XM began charging a MRF in July 2009, one year after the merger. *Id.* In January 2011, Sirius lowered the MRF that it charged subscribers. *Id.* ¶ 73. In 2010, Sirius XM had net income of $43 million. *Id.* ¶ 51. In 2011, its net income rose to $427 million. *Id.* The merged entity has 26% more subscribers than Sirius and XM combined had before the merger. *Id.* ¶ 49.

In 2009, a class of Sirius XM subscribers brought an action under antitrust laws based on the MRF, the elimination of free internet listening, and an increase in price for those who wanted to use their subscription through multiple receivers. *Id.* ¶ 76. The class based its antitrust claims on a definition of the relevant market as satellite digital audio services, the definition that the DOJ had rejected. *Id.* ¶ 77. Ultimately, Sirius XM settled with the class. *Id.* ¶ 81. Under the settlement, Sirius XM agreed that it would not raise the prices of certain services nor the MRF for five months (*i.e.*, until December 30, 2011). *Id.* ¶ 81. Sirius XM also agreed to pay $13 million in attorneys' fees. *Id.* ¶ 81. Sirius XM denied any wrongdoing. *Id.*

¶ 82. In approving the settlement, Judge Baer wrote that "class counsel did well to reach a settlement at all in view of the questionable liability [of Sirius XM] in this case." *Id.* ¶ 83.

Following the merger in 2008, Sirius XM had a substantial amount of debt, some of which was due as early as February 17, 2009. *Id.* ¶ 85. To explore refinancing options, Sirius XM retained Evercore Partners Inc. ("Evercore") and JPMorgan. *Id.* ¶¶ 89, 97. Karmazin and Sirius XM's Chief Financial Officer advised the board of their ongoing efforts to refinance the debt due on February 17, 2009. *Id.* ¶ 92. In December of 2008, Karmazin contacted Charles Ergen of EchoStar Communications Corporation ("EchoStar") and Dish Network Corporation ("Dish") to discuss potential refinancing transactions. *Id.* ¶ 94. In January of 2009, Sirius XM discussed possible transactions with EchoStar. *Id.* ¶ 98. Sirius XM and EchoStar did not, however, enter into a non-disclosure agreement ("NDA"). *Id.* ¶ 99.

Ultimately, EchoStar proposed multiple transactions with Sirius XM before February 17, 2009. Each transaction, however, would have given EchoStar a 51% equity share of Sirius XM. *Id.* ¶¶ 100, 102, 107. Any transaction that resulted in a third party obtaining an interest of more than 50% of Sirius XM's total voting stock would have constituted a change of control under Section 382 of the Internal Revenue Code, which would have caused Sirius XM to suffer billions of dollars in net operating losses ("NOLs") and forgo billions of dollars of tax savings. *Id.* ¶ 101.[3]

---

**3.** Shenk disputes this statement on the ground that it is a "conclusion of law." However, what legal consequences the defendants could realistically expect as a result of their actions is an important issue in this case, and Shenk does not explain how his interpretation of the relevant tax laws differs from defendants'. Moreover, Shenk elsewhere refers to evidence that indicates that Sirius XM worked together with a rival financier to structure a deal that would protect Sirius XM's NOLs, *see* Plaintiff's Rule 56.1 Statement of Undisputed Facts ¶ 227, suggesting

During the same period, Sirius XM discussed possible transactions with Liberty Media Corporation ("Liberty Media"). *Id.* ¶ 98. In early February 2009, the two parties entered a NDA and began due diligence. *Id.* ¶ 106. On February 10, 2009, Liberty Media sent Sirius XM a proposal that provided for a two-phase investment of $500 million. *Id.* ¶ 111. In the first phase, Sirius XM would receive a loan to repay the debts due on February 17, 2009. *Id.* In the second phase, Sirius would receive further loans to repay debts due later in 2009. *Id.* In return, Liberty Media would receive a 40% equity share in Sirius XM. *Id.* The Liberty Media transaction did not provide any bonus for Liberty Media's Chairman, John Malone. *Id.* ¶ 124.

Sirius XM's advisors prepared analyses of the competing transactions, which noted several problems with the EchoStar transaction. *Id.* ¶¶ 116–117.[4] Specifically, the advisors noted that the EchoStar transaction would effect a change in control that would cost Sirius XM billions of dollars in tax savings. *Id.* Moreover, because Sirius XM had not entered into a NDA with EchoStar, it had not undertaken any due diligence, a necessary condition of the transaction. *Id.* Because Sirius XM and EchoStar needed to execute a NDA and conduct due diligence before EchoStar's proposed transaction could occur, Sirius XM's advisors doubted whether the companies could complete the transaction before Sirius XM's debt came due. *Id.* The Liberty Media transaction, in contrast, did not pose these problems. *Id.* On February 17, 2009, the board approved the transaction with Liberty Media. *Id.* ¶ 123.

Under the investment agreement between Sirius XM and Liberty Media, Sirius XM needed either to obtain shareholder approval of preferred stock issuances or to invoke an exception to the requirement of shareholder approval provided by a NASDAQ rule. *Id.* ¶ 125.[5] Sirius XM's auditor was scheduled to issue an annual report on March 2, 2009. *Id.* ¶ 126. A qualified or "going concern" audit opinion would have constituted a default under certain of Sirius XM's credit agreements. *Id.* ¶ 127. On February 15, 2009, Sirius XM's board directed the company to apply for approval from NASDAQ to proceed with the Liberty Media transaction without obtaining shareholder approval. *Id.* ¶ 128. On February 18, 2009, NASDAQ allowed Sirius XM to proceed without shareholder approval. *Id.* ¶ 130. Subsequently, on March 10, 2009, Sirius XM's auditor filed an unqualified audit opinion. *Id.* ¶ 135.

On February 26, 2009, after Sirius XM had completed the first phase of its transaction with Liberty Media, but when Sirius XM could still escape the remainder of the transaction, it entered an NDA with Dish. *Id.* ¶ 138. Dish proposed a transaction in which it would acquire only a 38% equity share in Sirius XM. *Id.* ¶ 136. On March 3, 2009, Dish submitted another proposal to acquire a 38% equity share in Sirius XM. *Id.* ¶ 141. The next day, Sirius XM's board met to discuss the terms of Dish's

that he believes defendants' concerns were genuine.

**4.** Shenk purports to dispute this statement, but the evidence he cites does not contradict defendants' assertion that their advisors noted significant problems with the proposed EchoStar transaction. *See Giannullo v. City of New York,* 322 F.3d 139, 140 (2d Cir.2003)

("If the opposing party then fails to controvert a fact . . . set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.").

**5.** Once again, Shenk disputes this statement as a conclusion of law but fails to suggest any competing interpretation of what the parties' investment agreement required.

new offers. *Id.* ¶ 144. Ultimately, on March 6, 2009, the Board agreed to close the second phase of the Liberty Media transaction rather than to accept either of Dish's proposals. *Id.*

Against this factual background, the Court turns to the instant motion. Under Federal Rule of Civil Procedure 56(a), a party requesting summary judgment must demonstrate that there is "no genuine dispute as to any material fact" and that she is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[S]ummary judgment will not lie ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.... The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505.[6]

 The Court turns first to Shenk's securities fraud claims. To prevail on claim under Rule 10b–5, "a plaintiff must establish that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." *ECA v. JP Morgan Chase Co.,* 553 F.3d 187, 197

(2d Cir.2009) (quoting *Lawrence v. Cohn,* 325 F.3d 141, 147 (2d Cir.2003)). "A plaintiff cannot state a claim by citing snippets of corporate disclosures and alleging it is misleading; rather, such disclosures must be 'read as a whole.'" *In re Fannie Mae 2008 Sec. Litig.,* 742 F.Supp.2d 382, 396 (S.D.N.Y.2010) (quoting *Halperin v. eBanker USA.com, Inc.,* 295 F.3d 352, 358 (2d Cir.2002)). Furthermore, to satisfy the requirement of scienter, a plaintiff must produce evidence "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 99 (2d Cir.2007).

A brief review of the Court's reasons for denying defendants' previous motions to dismiss Shenk's securities fraud claims will clarify why summary judgment is now appropriate. Shenk's complaint alleged that Sirius repeatedly represented to shareholders and to regulators that the proposed merger would "provide consumers with more choices and lower prices." *Shenk v. Karmazin,* 867 F.Supp.2d 379, 387, 2011 WL 5148667, at *7 (S.D.N.Y. Oct. 28, 2011). To support an inference of scienter, Shenk's complaint contained two further allegations. First, it claimed that the defendants could have easily understood that price increases were inevitable because of each company's substantial debts. *Id.* Second, it alleged that Sirius made these allegedly false promises to shareholders and regulators at the same

---

**6.** At the outset, the Court notes that Shenk has abandoned any claim based on his complaint's allegation that that defendants enacted "a shareholder rights plan ('poison pill') that only benefited the Malone Group and that prevented other suitors from making unsolicited bids for Sirius at a higher price or on more favorable terms than the Malone transaction." Cmplt. ¶ 183(b). Specifically,

Shenk fails to address defendants' arguments concerning the shareholder rights plan in his brief, and, in response to paragraphs 153 and 154 of Defendants' Rule 56.1 Statement of Undisputed Facts, he argues that "the shareholder rights plan is not relevant ... to any of the claims or defenses remaining in this case."

time that it paid a $17.4 million fine to the FCC, the second largest in the agency's history, for having previously made "knowing[ ] and repeated[ ]" misrepresentations to that agency. *Id.* at 385, at *5.[7] Based on these allegations, the Court found that Shenk had plausibly alleged that the defendants should have been vigilant against the possibility of future misrepresentations, that they could have easily discovered the apparent falsity of Sirius's promises, and that defendants' failure to do so resulted from "conscious[ ] disregard[ ]" for either the truth of the statements or their duties as directors and officers.

■ None of these allegations, however, found support during discovery. While Sirius did tell its shareholders and the FCC that the merged entity would "provide consumers with more choices and lower prices," Defendants Rule 56.1 Statement of Undisputed Facts ¶ 34, it made such statements in the context of advising consumers that the merged entity would offer many new subscription packages, some of which would cost more and some of which would cost less than the existing package that each company had separately offered in the past, *id.* ¶ 36. Thereafter, Sirius concretized its commitment to "more choices and lower prices" by agreeing to offer certain specific subscription packages at prearranged prices for at least three years. *See* Aff. of Mary Elizabeth McGarry dated February 24, 2012 ("McGarry Aff.") Ex. 43 at 86–94. After the merger, Sirius XM honored its specific commitments. Defendants' Rule 56.1 Statement of Undisputed Facts ¶ 57. Given the fact that the companies made very specific promises—which were consistent with their statements concerning "more choices and lower prices"—and the fact that they kept those specific promises, no reasonable jury could find that the defendants permitted Sirius either to make a "materially false statement" or to "omit[ ] a material fact." [8]

In response, Shenk argues that some of Sirius's and XM's statements applied to more than just the specific prices that the companies ultimately agreed to maintain. Specifically, Shenk notes that, in one of its submissions to the FCC, the companies maintained that "no satellite radio subscriber will have to pay more as a result of the merger." McGarry Aff. Ex. 38 at 13. In the same filing, the companies asserted that "[s]ubscribers will also be able to continue their $6.99 multi-receiver subscriptions." *Id.* at 14. Notwithstanding that assertion, however, Sirius XM raised the price of a multi-receiver subscription to $8.99 in March of 2009, approximately

---

**7.** Discovery has disproved this allegation. While Sirius and XM paid fines of $2.2 million and $17.4 million, respectively, those fines resulted from an investigation into whether certain radios complied with Section 302(b) of the Communications Act of 1934 and whether the companies had operated certain terrestrial repeaters without proper authorization. Defendants' Rule 56.1 Statement of Undisputed Facts ¶ 46. The fines did not relate to the companies' efforts to manufacture interoperable radios, the subject of the alleged misrepresentations. *Id.*

**8.** Moreover, given that Sirius XM met its commitments to the FCC, Shenk's previous allegation that Sirius's and XM's debts preceding

the merger would unavoidably and obviously prevent the merged entity from honoring its commitments finds no support in the available record. In any event, even assuming that debt would have posed a problem, Morgan Stanley had argued to the defendants "that the combined company would be stronger than the individual premerger companies and thus be in a better position to refinance debt." Defendants' Rule 56.1 Statement of Undisputed Facts ¶ 16; *cf. In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir.1998) (finding forward-looking statements actionable only if "the speaker does not genuinely or reasonably believe them").

eight months after the merger closed. McGarry Aff. Ex. 46 at 4. Thus, Shenk concludes that, even if Sirius XM did not raise the specific prices it committed to maintaining, it disregarded the "spirit" of its statements when it raised the price for multi-receiver subscriptions, increasing the amount that some subscribers had to pay after the merger.

It is doubtful that disregarding the "spirit" of prior commitments could provide the basis for a cause of action. In any event, the companies made the statements upon which Shenk focuses on July 24, 2007, McGarry Aff. Ex. 38 at 103, eleven months before they made the more specific and qualified commitments on which the FCC relied in approving the merger, McGarry Aff. Ex. 43 at 86, and approximately a year before the FCC's approval of the merger permitted the occurrence of the securities transactions at issue here, *id.* at 1; *see also* Cmplt. ¶ 201(c). Moreover, when Sirius and XM made the statements on which Shenk now relies, they qualified their statements by acknowledging that they did "not have a predetermined time period during which the new prices will remain in effect" and that "programming and other costs likely will increase and these factors might impact future pricing decisions." McGarry Aff. Ex. 38 at 13–14 n. 31. No reasonable jury could find that the companies' adherence to the specific commitments they made in 2008 could be disregarded because, a year before they made those commitments, despite explicitly acknowledging that they

would not commit to any "predetermined time period," the companies had made a vaguer and more generalized promise not to charge customers more than they had charged previously. Thus, Shenk has failed to produce evidence showing that the defendants made any operative statement that was "materially false," either by its terms or in "spirit," and the Court has accordingly granted defendants' motion for summary judgment on Shenk's securities fraud claims.[9]

 Moreover, even assuming *arguendo* that the companies statements in 2007 were materially false—promising never to raise any prices when, in fact, at least some price increases proved necessary— Shenk's securities fraud claims would fail for the independent reason that he has not produced evidence from which a reasonable jury could infer that the defendants acted with the requisite scienter. As noted above, to prove scienter, a plaintiff must show either "that the defendants had both motive and opportunity to commit the fraud" or "evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 99 (2d Cir.2007). Here, Shenk argues that he has produced evidence showing conscious misbehavior. Specifically, he points to evidence in the record that indicates that, *before* the merger, Sirius planned to raise prices on the subscription packages that it alone offered. *See* Aff. of Melinda Ann Nicholson dated March 8, 2012 ("Nicholson Aff.") Ex. 30 (memo, sent on February 9,

---

**9.** Shenk also protested in his complaint about the MRF, the termination of free internet access, and Sirius XM's decision to charge cancellation and transfer fees that had previously applied only to Sirius's (and not to XM's) customers. *Cf.* Defendants' Rule 56.1 Statement of Undisputed Facts ¶¶ 65–71. However, the companies made no commitments to the FCC or to shareholders regarding any of these prices, and they are thus subject to the

same analysis the Court applied to the price of multi-receiver subscriptions. With respect to the MRF, the FCC's order approving the merger explicitly acknowledged that, "after one year, Applicants may pass on cost increases to their subscribers," including "statutorily or contractually required payments to the music, recording and publishing industries." McGarry Aff. Ex. 43 at 12 & n. 80.

2006, describing "price change effect of increasing the price from $12.95 to $14.95 in April, 2007"); *see also* Nicholson Aff. Ex. 42 at 16. Shenk concludes that, because the defendants considered raising prices at Sirius, they must also have considered raising them at the merged entity, a consideration their public comments belied.

However, what Sirius planned to do if it continued to operate as a separate company indicates nothing about what the two companies planned to do if they successfully merged. While Sirius alone might have needed to raise prices to manage its debts, Morgan Stanley had advised the defendants "that the combined company would be stronger than the individual premerger companies and thus be in a better position to refinance debt." Defendants' Rule 56.1 Statement of Undisputed Facts ¶ 16. Thus, even if the defendants had believed that Sirius alone would have needed to raise prices, such a belief would have had no reliable implications about the needs of the merged entity. Accordingly, the evidence on which Shenk relies is inapposite, and no reasonable jury could find that defendants' beliefs about a course of events that never occurred reflected their beliefs about the very different events that transpired, rendering their public comments knowingly or recklessly false.[10]

■ Turning to Shenk's claims that the defendants breached their fiduciary duties by failing to make certain disclosures, the Court has granted defendants' motion for summary judgment for substantially the same reasons that it has granted summary judgment on Shenk's securities fraud claims. Sirius XM's certificate of incorporation includes a clause that exculpates directors for breaches of their duty of care, as permitted by Del.Code Ann. tit. 8, § 102(b)(7). Defendants' Rule 56.1 Statement of Undisputed Facts ¶ 2. Thus, to prevail on any breach of fiduciary duty claim against any defendant other than Karmazin, who may have acted in his capacity as an officer, Shenk must produce evidence from which a reasonable jury could infer that the defendants violated either their duties of good faith or their duties of loyalty. A director violates the duty of good faith by, for example, engaging in "intentional misconduct or a knowing violation of law." Del.Code Ann. tit. 8, § 102(b)(7); *see also In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006). "To prevail on ... a bad faith claim, the plaintiff must overcome the general presumption of good faith by showing that the board's decision was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests." *White v. Panic*, 783 A.2d 543, 554 n. 36 (Del.2001).

■ "When seeking the affirmative vote of stockholders, the Board has a duty

---

**10.** Shenk also attempts to rely on the following passage from one defendant's email to his son on February 21, 2007, seven months before Sirius's proxy statement: "We are having a tough time with the 'more choices, lower prices' ... since our rates are currently so low that we are each losing a billion dollars a year.... We're working hard to see if we can have 'smaller packages' for a lower rate so we can use that argument ... in the meantime, we're basically waffling when asked specifically about price decreases." Nicholson Aff. Ex. 43. Actually, this email, far from suggest-

ing that the defendants knew of or recklessly disregarded the falsity of any statements, suggests that the defendants worked carefully to ensure that they did not make false statements, refraining from using the words "lower prices" until they could give those words a definite meaning. (Additionally, the email also undermines Shenk's claims that "lower prices" referred to more than the specific commitments that defendants made to offer options that were less expensive than the subscription packages that preceded the merger.)

to disclose all material information." *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 66 (Del.1995). Information is material if "under all circumstances," it "would have assumed actual significance in the deliberations of the reasonable shareholder." *Id.* (quoting *Arnold v. Soc'y for Sav. Bancorp., Inc.*, 650 A.2d 1270, 1277 (Del.1994)). Because the defendant directors are liable only for breaches of the duty of good faith, Shenk must produce evidence showing that their failure to disclose material information amounted to "intentional conduct" or "bad faith." As noted above, however, defendants did not omit any material information from their public statements, including the proxy statement issued to shareholders in connection with the merger. *See* Defendants' Rule 56.1 Statement of Undisputed Facts ¶ 36.

While Shenk contends that Sirius XM's post-merger conduct violated some tacit, general promise that defendants made to shareholders and regulators, the Court has already rejected that interpretation of the relevant statements, and Shenk has not credibly identified any material information that the defendants omitted. Indeed, the proxy statement acknowledged that the companies' combined "indebtedness could adversely affect the [merged] company in many ways," *id.* ¶ 33, and the early regulatory filings on which Shenk relies acknowledge that the companies did "not have a predetermined time period during which the new prices will remain in effect," McGarry Aff. Ex. 38 at 13–14 n. 31. Moreover, to the extent Shenk claims that the defendants should have disclosed Sirius's

preexisting plans to raise prices if the companies did not merge, the Court has already explained above why that information did not pertain to the merged companies' plans and, thus, why no reasonable jury could have found that such plans "would have assumed actual significance in the deliberations of the reasonable shareholder." Accordingly, the Court has granted defendants' motion for summary judgment on Shenk's claim that the defendants breached their fiduciary duties by failing to disclose material information.[11]

Turning to Shenk's claim that defendants breached their fiduciary duties by approving Liberty Media's refinancing transaction rather than the rival transactions proposed by EchoStar and Dish, the Court again has granted defendants' motion for summary judgment. Courts considering a claim based on the choice of one refinancing transaction, rather than another, presume that "the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company." *In re Walt Disney*, 906 A.2d at 52 (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del.1984)). "When an independent and active board has been assisted by non-conflicted advisors, a Delaware court rarely will have cause to second guess this type of tactical decision." *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 840 n. 5 (Del.Ch.2011). Nonetheless, directors violate their duties of loyalty if they approve a refinancing transaction solely or primarily "to perpetuate [their] own control." *Kahn v. Roberts*, 1994 WL 70118, at *6 (Del.Ch. Feb. 24,

---

11. Shenk argues that because Karmazin acted in his capacity as an officer, rather than a director, Sirius XM's § 102(b)(7) clause does not exculpate him from breaches of his duty of care. *See Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1288 (Del.1994). But, even assuming *arguendo* that Shenk does not

need to show "bad faith" or "intentional misconduct" with respect to Karmazin, Karmazin is still entitled to summary judgment based on the Court's finding that no reasonable jury could conclude that the defendants omitted material information from their statements to shareholders and regulators.

1994). Moreover, where "a fundamental change of corporate control occurs or is contemplated," a court "must be mindful of 'the omnipresent specter that a board may be acting primarily in its own interests, rather than those of the corporation and its shareholders.'" *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1286 (Del.1989) (quoting *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del.1985)); *see also Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del.1986).

■ Once again, discovery has disproved, indisputably, the allegations on which Shenk relied in opposing defendants' motion to dismiss. In his complaint, Shenk alleged that Ergen insisted that any refinancing transaction impose a condition requiring the defendants to resign. *Shenk*, 867 F.Supp.2d at 387, 2011 WL 5148667, at *7. Shenk further alleged that the Malone transaction did not require the defendants' resignation and that Malone capitalized on defendants' fear of ouster to extract a personal "bonus" from the transaction and to augment the compensation of Karmazin, his friend. *Id.* Each allegation has proved to be untrue or unsupported. None of EchoStar's proposals required defendants' resignation, and none of Liberty Media's proposals ensured that the defendants would retain their positions. Defendants' Rule 56.1 Statement of Undisputed Facts ¶¶ 112–113. Moreover, the transaction between Sirius XM and Liberty Media did not award Malone any "bonus." *Id.* ¶ 124. Finally, Sirius XM did not increase Karmazin's compensation until June 30, 2009, months after the refinancing transaction occurred. *Id.* ¶ 160.

Unable to rely on the theory that prevailed on the motion to dismiss, Shenk attempts to construct a new theory based on the heightened scrutiny that applies if "a fundamental change of corporate control occur[ed] or [was] contemplated."

*Barkan*, 567 A.2d at 1286; *see also Revlon*, 506 A.2d at 182. In such circumstances, directors may not act based on a "selfish or idiosyncratic desire . . . to tilt the playing field towards a particular bidder for reasons unrelated to the stockholders' ability to get top dollar." *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1000–01 (Del.Ch.2005). Such a heightened standard does not, however, apply to the instant case because the defendants explicitly sought to avoid a change of control, which would, at least according to defendants' advisors, have cost the company billions of dollars in tax savings. *See* Defendants' Rule 56.1 Statement of Undisputed Facts ¶ 101. While Shenk has produced evidence that suggests that Sirius XM worked more diligently with Liberty Media than it did with EchoStar to structure a deal that did not result in a change of corporate control, *see* McGarry Aff. Ex. 141 ("I think we will find a way with LM to retain the nol's."), such favoritism does not support a finding that the directors sought a change of control, triggering additional scrutiny. *See In re Smurfit–Stone Container Corp. S'holder Litig.*, 2011 WL 2028076, at *12 (Del.Ch. May 20, 2011).

Applying Delaware law's presumption that the defendants "acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company," the Court concludes Shenk has not produced evidence that would allow a reasonable jury to conclude that defendants engaged in "intentional misconduct," acted in bad faith, or violated their duty of loyalty to the corporation. As noted above, Shenk has produced some evidence that, leading up to the February 17, 2009 deadline on which some of the company's debt came due, the defendants pursued negotiations with Liberty Media more aggressively than they pursued negotiations with EchoStar. *See*

Nicholson Aff. Ex. 71 ("[EchoStar is] willing to sign NDA [sic] that was presented to them ... and they are willing to fly to NYC as early as tomorrow to engage and start the process. They already asked Citi to call me and to coordinate a meeting tomorrow to walk us through their proposal and rationale [sic] behind the terms."). Moreover, Shenk has produced both an analyst report and a *New York Times* article indicating that Ergen wanted to replace the defendants, giving them a motive for favoring a transaction with Liberty Media. *See id.* Ex. 74 at 2 ("Liberty control could also benefit Sirius management, which would likely be displaced if Ergen took over, given Ergen's inclination toward control."); *id.* Ex. 78 ("If the [Liberty Media] deal doesn't hit a last-minute snag, Mr. Karmazin will have managed to save his company—and his job (Mr. Ergen wanted to fire him)—by pitting some of the most hard-nosed negotiators in the business against each other, all while he held what no doubt looked to be a losing hand.").

Such evidence, however, does not overcome the Delaware law's presumption that the defendants impartially exercised their best judgment. The defendants may have had an incentive to pursue a transaction that did not empower someone who desired their removal. Nonetheless, the company needed to quickly close a transaction that would allow it to repay its most pressing debts. In light of that need, the defendants had a proper basis for favoring an offer that did not cost the company billions in tax savings over other offers that, at least according to their initial terms, did. Defendants' Rule 56.1 Statement of Undisputed Facts ¶¶ 100, 102, 107. Sirius XM's advisors noted this problem with the EchoStar proposals in their analysis of the competing transactions' merits. *Id.* ¶¶ 116–117. Because the defendants had a reasonable basis for favoring the Liberty Media transaction that did not depend on any interest they may have had in retaining their positions, no reasonable jury could find that Shenk's evidence rebuts the presumption that the defendants "acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company." *Cf. In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 831 (Del.Ch. 2011) ("If a board selected one of several reasonable alternatives, a court should not second-guess that choice even though it might have decided otherwise or subsequent events may have cast doubt on the board's determination." (quoting *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 42 (Del.1994))).[12]

The same analysis applies to the defendants' rejection of the offers Dish submitted before Sirius XM had completed the second phase of its transaction with Liberty Media. Because, under both of Dish's proposals, Dish would have acquired only a 38% equity share in Sirius XM,

---

**12.** While Shenk originally alleged in his complaint that the defendants breached their fiduciary duties by invoking an exception to the requirement of shareholder approval in order to close the first phase of Sirius XM's transaction with Liberty Media, he has not responded to defendants' arguments on summary judgment. Accordingly, he has conceded that defendants are entitled to summary judgment on this claim for breach. *See Taylor v. City of New York*, 269 F.Supp.2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."). In any event, Shenk has not rebutted defendants' showing that seeking shareholder approval might have delayed the completion of the transaction, resulting in the issuance of an unfavorable audit opinion, which would have constituted default under certain of Sirius XM's credit agreements. *See* Defendants' Rule 56.1 Statement of Undisputed Facts ¶¶ 127–129.

Defendants' Rule 56.1 Statement of Undisputed Facts ¶¶ 136, 141, Shenk once again may not invoke the heightened standard that applies to cases involving a change in control. Shenk argues that the defendants breached their fiduciary duties by rejecting the Dish proposals in a forty-one minute "telephonic meeting," McGarry Aff. Ex. 71, even though Sirius XM had performed analyses that showed that the proposals were more favorable for the company than the Liberty Media deal, Nicholson Aff. Exs. 80–82.[13] Sirius XM's advisers cautioned, however, that accepting either of Dish's proposals would have required the company to pay millions of dollars more in interest by 2012 than completing the Liberty Media transaction would have required it to pay. McGarry Aff. Ex. 155 at 3. Moreover, the advisors also noted that withdrawing from the Liberty Media deal would have required Sirius XM to pay $50 million in break-up fees and call premiums. *Id.* Here, as above, because the defendants selected "one of several reasonable alternatives," no reasonable jury could conclude that Shenk has rebutted the presumption that defendants "acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company."[14]

Perhaps sensing that the evidence in record does not support his claims, Shenk also attempts to fashion a new claim for breach of fiduciary duty based on defendants' approval of Karmazin's compensation. Shenk, however, totally failed to plead such a claim in his complaint. Indeed, the complaint identifies Karmazin's compensation as an unfavorable term of the Liberty Media transaction, placing the allegation in a section entitled "Defendants Further Breach Their Fiduciary Duties by Agreeing to Accept Predatory Financing." Cmplt. ¶ 123. The complaint does not include Karmazin's compensation in its list of defendants' breaches of their fiduciary duties, *id.* ¶ 183, but instead lists it as an *injury* resulting from defendants' breaches, *id.* ¶ 187. In response to defendants' motion to dismiss Shenk's complaint in its entirety, Shenk did not argue that he had a valid claim based on Karmazin's compensation, and the Court did not discuss any such claim. *Shenk,* 867 F.Supp.2d at 381, 2011 WL 5148667, at *1 (describing Shenk's claims). At this late stage of the case, Shenk cannot invent new claims merely because he has failed to produce evidence that supports his old ones.

 Even if, contrary to fact, Shenk had preserved a claim for breach of fiduciary duty based on Karmazin's compensation, the Court would grant summary judgment on that claim. "The directors of a Delaware corporation have the authority and broad discretion to make executive compensation decisions." *In re Citigroup Inc. S'holder Derivative Litig.,* 964 A.2d 106, 138 (Del.Ch.2009). Directors breach their fiduciary duties only if an executive's compensation "is so disproportionately large as to be unconscionable and constitute waste." *Id.* (quoting *Brehm v. Eis-*

---

**13.** The evidence Shenk cites hardly supports this claim. The cited balance sheets indicate that the company predicted that, under the Liberty Media transaction, "Total Stockholders' Equity" would be greater in 2009 by less than one percent and less in 2010 by less than one percent than it would have been under the compared Dish transaction. *Compare* Nicholson Aff. Ex. 81 at 4, *with id.* Ex. 81 at 4.

**14.** To the extent that, because Karmazin acted as an officer, he faces liability for breach of his duty of care, he is still entitled to summary judgment. To establish a breach of the duty of care, Shenk would have to show that Karmazin "acted with gross negligence." *Walt Disney,* 906 A.2d at 53. The reasonable bases for the defendants' business decisions would prevent a reasonable jury from making such a finding in this case.

*ner*, 746 A.2d 244, 262 n. 56 (Del.2000)). Shenk has produced evidence that the defendants approved compensation for Karmazin in 2009 worth more than $43 million. Nicholson Aff. Ex. 106 at 17; *id.* Ex. 7A at 22. Because Sirius XM's stock price has increased dramatically, stock options that Karmazin received in 2009 are now worth over $200 million. But Karmazin presided over a merger that transformed two companies that had consistently lost money, Defendants' Rule 56.1 Statement of Undisputed Facts ¶¶ 3, 5, into one that had a net income of $427 million in 2011, *id.* ¶ 51. Shenk's reliance on *Citigroup*, where "the Company paid [a] multi-million dollar compensation package to a departing CEO whose failures as CEO were allegedly responsible, in part, for billions of dollars of losses at Citigroup," 964 A.2d at 138, is wholly misplaced. No reasonable jury could find that paying Karmazin $43 million in 2009—which increased to $200 million only because of the company's successes—was "unconscionable and constitute[d] waste."

In sum, for the reasons described above, the Court reaffirms its May 30, 2012 Order granting defendants' motion for summary judgment in its entirety and dismissing Shenk's complaint. The Clerk of the Court is hereby directed to enter final judgment dismissing the case.

SO ORDERED.